507 So.2d 266 (1987)
Wade Anthony WHITTLE, Plaintiff-Appellee,
v.
MILLER ELECTRICAL MANUFACTURING COMPANY, Defendant-Appellant.
No. 86-562.
Court of Appeal of Louisiana, Third Circuit.
May 13, 1987.
Rehearing Denied June 10, 1987.
*267 Franklin, Moore and Walsh, Albert Dale Clary, Baton Rouge, for defendant-appellant.
Drew Ranier, Lake Charles, for plaintiff-appellee.
Before GUIDRY and FORET, JJ., and CULPEPPER, J. Pro Tem.[*]
GUIDRY, Judge.
This suit for personal injuries arose out of an accident which occurred on July 14, 1980, at the Louisiana Natural Gas Plant (LNG) in Lake Charles, Calcasieu Parish, Louisiana. At the time of the accident, plaintiff, Wade Anthony Whittle, was working as a "grinder" for Pittsburgh Des Moines Steel Company in the construction of several large tanks for LNG. At the time of the accident, Whittle was in a kneeling position crawling along a stiffener ring grinding welds to make them smooth.[1] As Whittle crawled along the stiffener ring, he encountered a welding lead which was attached to a Miller Syncrowave 300 welding machine, manufactured by defendant, which was then in operation. When *268 plaintiff grabbed the welding lead to move it out of his way, he received a shock which threw him over the top of the inner wall of the tank and onto scaffolding located between the inner and outer walls of the tank.
As a result of being thrown over the inner wall and onto the scaffolding, plaintiff received various bruises, a severe cut on his nose and a cervical spinal cord injury diagnosed as a dislocation of the cervical vertebrae between C-6 and C-7 which caused left side weakness and diminished sensation, plus diminished range of motion and severe pain in his neck. The plaintiff underwent surgery in which C-5, C-6, C-7 and the first thoracic vertebrae were fused.
Plaintiff instituted this suit against defendant, the manufacturer of the Miller Syncrowave 300, alleging defendant's strict liability for designing and manufacturing a product unreasonably hazardous in normal use, and for the manufacturer's failure to adequately warn of inherent danger in the use of its product. After trial, the jury concluded that the accident and injuries suffered by plaintiff resulted from the combined fault of both parties and allocated 60% fault to defendant and 40% fault to plaintiff. The jury fixed plaintiff's total damages at $563,000.00 before reduction by reason of his comparative fault. Judgment was rendered and signed in accordance with the jury verdict.
Defendant-appellant filed motions for judgment notwithstanding the verdict, new trial and remittitur. On February 4, 1986, the trial court granted defendant's motion for new trial. In ruling favorably on defendant's motion for new trial, the trial judge stated:
"THE COURT: Well, the Court finds itself in a very peculiar position with this case. One thing is, I'm a welder, and I also use high frequency machines, and I know, of my own knowledge, not in evidence in this case, that high frequency doesn't shock you. It doesn't cause muscle contractions that low frequency causes. I didn't see in the evidence in this case that anyone really said that high frequency does shock; it's a law of physics or a law of electricity, I guess. I could not understand how the Jury got confused and thought you could get shocked with high frequency. I think you're entitled to a new trial, and it's granted."
Plaintiff thereafter applied to this court for a supervisory writ which was granted. On March 12, 1986, this court reversed the trial court's order granting a new trial and reinstated the jury verdict concluding that the trial court abused its discretion in granting a new trial as the decision to do so was based on the trial judge's own personal knowledge. Whittle v. Miller Electric Mfg. Co., our docket number 86-123. On April 7, 1986, the trial court denied defendant's previously filed motion for judgment notwithstanding the verdict and defendant perfected this appeal assigning the following as errors:
1. The trial court erred in refusing to grant a motion for judgment notwithstanding the verdict even though the trial court determined the jury verdict was manifestly erroneous.
2. The jury erred in determining that the welding machine was unreasonably dangerous and that the welding machine caused plaintiff's injuries.
3. The trial court erred in refusing to allow evidence of a prior inconsistent statement.
4. The amount of general damages awarded by the jury is clearly excessive.
Plaintiff also appealed urging that the jury verdict was in error only insofar as it found him to be 40% at fault.
We first consider whether the jury clearly erred in its conclusions as to liability.
It is undisputed that the plaintiff received a severe electrical shock when he attempted to move a welding lead which was attached to a Synchrowave 300 welding machine, which was then in operation. It is likewise without dispute that this electrical shock was a substantial cause of his injury.
According to the record, the Synchrowave 300 welding machine is designed and manufactured to perform both Shielded *269 Metal Arc Welding (SMA) and Tungsten Inert Gas Welding (TIG). The Synchrowave generates two types of electrical current, a high frequency electricity, also referred to as high frequency, high voltage current (3000 volts at 1.2 to 25 megahertz) and a welding current (75-80 volts at 60 hertz). Cables or welding leads attached to the Synchrowave carry the two types of current to the work area. Miller does not manufacturer welding leads and there is no evidence that the cables involved in this case were furnished by Miller. The welding leads are insulated with a material capable of protecting against a current of 600 volts. The welding current, also known as open circuit voltage, is the electricity that is used to do the actual welding. It is the welding current which actually melts the electrode or welding rod at the point of the weld in SMA welding. The high frequency electricity generated by the Synchrowave is intended for use only in TIG welding. In this specialized welding process, the welder does not touch the electrode to the metal being welded, rather a non-consumable electrode or welding rod is used and the high frequency electricity is superimposed over the welding current to initiate and stablize the arc at the weld. This is accomplished by the high frequency electricity ionizing the air or forming a bridge between the electrode and the metal over which the welding current travels.
The high frequency switch on the Synchrowave provides three positions which determine the length of time the high frequency is either on or off. In the "start" position, high frequency is present at the welding electrode when the arc is initiated and for approximately 2.5 seconds thereafter; in the "continuous" position, the high frequency is on all the time; and, in the "off" position, high frequency is not available. The Synchrowave owners manual cautions that the high frequency switch should be placed in the "off" position before performing SMA welding. However, this warning cautions only as to possible shock to the operator because the use of high frequency to establish an arc with a stick electrode might cause an arc to form between the electrode holder and the operator.
At the time plaintiff was shocked, the welders on the job site were engaged in SMA welding. The record establishes that, although engaged in this particular welding process, the high frequency switch on the Synchrowave was purposely left in the "continuous" position. The evidence establishes that the welders did so because, when performing SMA welding with a high nickle type rod, as was being done in this case, it is difficult to restrike or re-establish the arc without the high frequency feature.
In support of his claim that defendant is strictly liable, plaintiff urges that the evidence supports the conclusion that the high frequency electricity generated by the Synchrowave has the capacity to leak or bleed through insulated cable in good condition and when in continuous use the high frequency electricity will form a high capacity charge on the outside of the cable or lead which can cause severe electrical shock to anyone who touches the welding lead. Further, plaintiff contends that the defendant, although aware of this hazard, failed to adopt alternative design features which would eliminate or greatly minimize the danger of electrical shock and/or failed to adequately warn. Defendant, although conceding that the high frequency current generated by the Synchrowave will leak or bleed through insulated leads in good condition, urges that the record confirms that such high frequency current will not shock. Therefore, defendant reasons that plaintiff has failed to show that the Synchrowave is unreasonably dangerous in normal use and Miller had neither the duty to warn nor the duty to adopt alternate designs.
Four experts testified in this case: George Greene, Jr. and Leo Veal for the plaintiff; and Dan J. Corrigall and Gerhard K. Williecke for the defendant. All experts, except George Greene, Jr., agreed that high frequency, high voltage current does not shock. Further, all experts agreed that the high frequency current could bleed through or pierce the welding leads through invisible cracks and/or pin *270 holes. Finally, all of the experts agreed that, unless the welding leads were damaged, the insulation or outer protective covering would prevent any leakage or bleed through of the welding current by itself.
Leo Veal demonstrated high frequency, high voltage leakage through an undamaged cable by draping the lead over an iron bar and producing sparks between the end of the bar and a grounded surface. He testified that the demonstration illustrated a "potential hazard" and that he had, in the past, "not one time but a number of times, in my life had this burn me ...". He further testified that he was not injured in the demonstration because he was careful: "Well, I just pushed it quickly so that I wouldn't stay there long enough to get the high frequency burn, and ... I was dry."
George Greene, Jr., plaintiff's other expert, is a mechanical engineer who specializes in accident reconstruction, failure analysis and safety engineering. Mr. Greene admitted that he had never worked for a welding machine manufacturer, that he had never been involved in the design of welding equipment, and that his inspection and testing of the Miller machine in question was limited to one time, the morning he testified. Yet, Mr. Greene's testimony was unequivocal and unwaivering:
"It's my opinion that under the environmental conditions and the welding work place on the day in question, July 14, 1980, Mr. Willicke (sic) being wet, there being damphigh humidity in the environment he was working in, when he picked up the welding leads for this high frequency, high voltage machine, the high voltage bled through and formed a high voltage capacity charge on the outside cover. When he picked that up, he was rendered a significant shock, which caused him touh, muscular contractions, which caused him to fall off the scaffolding, sir.
....
Well, it's my opinion that the shock that Mr. Whittle suffered was the normal high voltage leakage coming off the Miller Syncrowave 300 machine, and not any bare leads or cuts or damaged conductors or insulators on the conductors themselves, sir. It's a high frequency, high voltage phenomenon is what caused his shock to occur, sir."
Although Greene's theory was lent some credence by Veal's testimony concerning high frequency burns, it was completely repudiated by the testimony of both defendant's experts and was shown to be completely erroneous by Mr. Corrigall's courtroom demonstration.
Gerhard K. Williecke, who retired from Miller after approximately 30 years of service to start his own consulting firm, testified unequivocally that the high frequency (1.2-25 megahertz or million cycles per second) electricity generated by the Syncrowave machine would not shock. He stated that the high frequency voltage, when brought in contact with a person, "would flow pretty much on the outside of ... [his] skin. So, actually high frequency is considerably safer ... because the current tends to travel on the outside of the body and, therefore, not give you the hazardous effects that you would have at lower frequency".
Don J. Corrigall, defendant's other expert, not only agreed with Williecke's testimony but put on a convincing demonstration in the courtroom in support of the conclusion that high frequency electricity does not shock or burn regardless of the environmental conditions present. Using a Miller HF250, a high frequency isolator, which all experts agreed, produces the same high frequency current as that produced in the Syncrowave machine, Corrigall not only reproduced the sparks demonstrated by Veal, but using his bare hands, first dry and then wet and salty proceeded to grab and hold onto not only the leads but the electrodes on the ends with no apparent effect. Corrigall also demonstrated the "skin effect" Williecke testified to by grabbing the energized cable in one hand and causing a light bulb held in the opposite hand to glow.
In Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110, 113 (La.1986), the Supreme Court set forth the basic principles *271 applicable in strict tort products liability as follows:
"There is general agreement upon the most basic principles of strict tort products liability. In order to recover from a manufacturer, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. The plaintiff need not prove negligence by the maker in its manufacture or processing, since the manufacturer may be liable even though it exercised all possible care in the preparation and sale of its product. Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985); Hebert v. Brazzel, 403 So.2d 1242 (La.1981); DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La. 1981); Hunt v. City Stores, 387 So.2d 585 (La.1980); Chappuis v. Sears, Roebuck & Co., 358 So.2d 926 (La.1978); Weber v. Fidelity & Casualty Ins. Co. of New York, 259 La. 599, 250 So.2d 754 (1971).
As strict products liability in tort was originally conceived, the manufacturer's ability to know of the danger of its product at the time of sale was immaterial. Under pure strict liability theory, the product is on trial, not the knowledge or conduct of the manufacturer. Subsequently, additional products liability theories developed which permit the plaintiff to recover when the manufacturer fails to give adequate warning or adopt an alternate design to make the product safer. Under these later theories, the knowledge available to the manufacturer when it designs, manufactures, and markets the product may be material. Accordingly, whether the knowledge of the danger in a product is material, relevant, or admissible depends on the particular theory of recovery under which the plaintiff tries his case."
In the instant case, plaintiff contends that defendant's product, the Miller Syncrowave 300 welding machine, is unreasonably dangerous in normal use because it produces high frequency, high voltage electricity, which has a capacity to leak or bleed through insulated cable in good condition, causing severe electrical shock. He urges that he suffered injury by reason of this condition. Finally, plaintiff urges that defendant failed to give adequate warning of this condition and failed, as well, to adopt alternate designs which would have made the product safer. Applying the basic principles applicable in strict products liability cases, it was incumbent upon plaintiff to establish by a reasonable preponderance of the evidence, among other elements, that high frequency, high voltage electricity can cause electrical shock. It necessarily follows that, failing in this proof, plaintiff's demands must be rejected.
Presumably, the jury concluded that the high frequency, high voltage electricity generated by the Miller Syncrowave can cause electrical shock and did so in this case causing plaintiff's injuries. The issue then becomes whether this finding is manifestly erroneous or clearly wrong. As stated by the Supreme Court in Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978):
"... the appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong (manifestly erroneous)."
The only evidence supporting the jury's conclusion is the opinion testimony of George Greene, Jr. Although Veal testified that under certain conditions, i.e., wetness and prolonged exposure, leakage or bleed through of high frequency electricity would present a "potential hazard" for a burn, he agreed that high frequency electricity would not shock. There is no evidence that plaintiff sustained a burn. Further, Veal did not testify that exposure to high frequency leakage or bleed through would cause the muscular contractions experienced by plaintiff. The testimony of the other experts and the demonstration performed by Corrigall is convincing that even though high frequency current will leak or bleed through good welding leads, such constitutes no danger as it does not shock.
*272 In weighing opposing expert opinions, the trier of fact should consider the education and experience of the expert in the particular science or field, the reasons given in support of the opinion, and the other evidence which supports or detracts therefrom. Our careful review of this record convinces us that the jury clearly erred when it accepted the testimony of Greene over that of all other experts, including Veal, plaintiff's other expert witness. The record leaves no doubt but that the learned trial judge was likewise convinced that the jury was clearly in error.
Accordingly, we find the jury was clearly wrong in its determination that the Miller Syncrowave welding machine was unreasonably dangerous in normal use and a cause of plaintiff's injuries.
Having so found, we need not address defendant's other assignments of error or plaintiff's allegation of error.
For the reasons stated, we reverse the judgment of the trial court and enter judgment in favor of defendant, Miller Electrical Manufacturing Company, and dismiss plaintiff's, Wade Anthony Whittle, suit with prejudice. All costs at both the trial and appellate levels are assessed against plaintiff, Wade Anthony Whittle.
REVERSED AND RENDERED.
NOTES
[*] Hon. William A. Culpepper, Judge, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] The stiffener ring is described in the record as an I-beam approximately two feet wide, located about three feet below the top of the inner wall of the LNG tank.