615 So.2d 547 (1993)
Hazel COCKERHAM, Plaintiff-Appellee,
v.
ATLANTIC RICHFIELD CO., et al., Defendants-Appellants.
No. 92-200.
Court of Appeal of Louisiana, Third Circuit.
March 3, 1993.
Rehearing Denied April 14, 1993.
*548 Carl H. Hanchey, Lake Charles.
John Taylor Bennett, Marksville.
Charles Shelby Norris, Jr., Monroe.
Before STOKER, THIBODEAUX and COOKS, JJ.
THIBODEAUX, Judge.
Atlantic Richfield Company (ARCO) appeals a trial court decision finding it negligent in failing to cut a well casing, located in a pasture, at least two feet (2') below the plow depth in accordance with Statewide Order No. 29-B Section XIX(j) promulgated by the Louisiana Department of Conservation. Alternatively, ARCO appeals the trial court's finding that the plaintiff, Hazel Cockerham, was only ten percent (10%) at fault and that the award of general damages was excessive. Cockerham, the plaintiff, answers the appeal contending that neither she nor the driver of the four-wheel *549 all terrain vehicle, Kirby Dayton, should have been found negligent and, alternatively, that the percentage of negligence assessed to them should be reduced. After a careful and thorough review of the record and the jurisprudence, we affirm the trial court's findings of negligence, allocations of fault and general damage award.

FACTS
This suit arises out of injuries sustained by Cockerham on February 16, 1990 on the property of John Mark Taylor, Patricia Walsh Taylor, Emmett D. Taylor, Jr. and Debra Estis Taylor located in Catahoula Parish near Manifest, Louisiana. Cockerham, a 53 year old woman who lives with Dayton, is employed as a surgery technologist at Riverlands Medical Center in Ferriday, Louisiana. After eating supper at Dayton's mother's house, Dayton and Cockerham decided to take a ride on Dayton's four-wheeler to look for a place where they could rabbit hunt the next day. Cockerham rode as a passenger on the 1989 Yamaha four-wheeler that was being driven by Dayton. The couple left at approximately 7:00 p.m. The February evening was misty and foggy. After traveling over various properties, when it was near dark (dusk), Dayton and Cockerham arrived at the Taylor property where a barbed wire fence with a post on one end that ties to a stationary object formed a gap when opened allowing Dayton to drive the four wheeler through the fence to enter the Taylor property. Dayton testified that he had been on the Taylor property many times since he was a child, although he was never given specific permission to go on their property. To facilitate visibility, Dayton proceeded through the Taylor property using his low beams. While proceeding through the property, Dayton was able to avoid one abandoned oil well casing that was located near some trees. He testified that he knew the well casing was there. Soon thereafter, while proceeding across the Taylor property, which was a flat, bare pasture, Dayton struck another abandoned oil well casing, the Mrs. A.A. Webb No. 1 Well (Webb Well), which he claims he did not see although he was looking straight ahead, and could see ten to fifteen yards in front of him and was using his low beams. The Webb Well casing protruded approximately twelve inches (12") above the ground and was approximately ten (10") inches wide.
As a result of Dayton striking the Webb Well casing, both Dayton and Cockerham were thrown from the four-wheeler with Cockerham sustaining a fractured right ankle which required surgery to correct and seven fractured ribs.
The Sinclair-Prairie Oil Company (now ARCO) leased the land from the Taylors' predecessors in title on March 1, 1941, who granted a mineral lease to Sinclair-Prairie Oil Company for a term of two years. A permit to drill the Webb Well was obtained on October 4, 1944. Thereafter, Sinclair-Prairie proceeded to drill Webb Well and on or near December 13, 1944, Sinclair-Prairie Oil Company plugged and abandoned Webb Well but did not cut the casing below plow depth. The Sinclair-Prairie Oil Company lease pertaining to Webb Well was released on April 19, 1945.
Order 29-B, requiring well casings to be cut at a minimum of two feet (2') below plow depth, was promulgated on September 1, 1974. Section XIII of that order states its effective date as August 1, 1943.
The trial court found that Order 29-B, promulgated by the Louisiana Department of Conservation, was effective as of August 1, 1943. The trial court further found that Order 29-B applied to ARCO and that the Department of Conservation Commissioner's reason for promulgating the order was to protect people and property against injury and damage. The trial court applied the duty/risk analysis and concluded that ARCO breached a legal duty to protect the public from the type of injuries suffered by Cockerham. Simply put, ARCO should have cut the well casing. The trial court then assessed ARCO and Dayton with each forty-five percent of the fault and Cockerham with ten percent of the fault for Cockerham's injuries. The court set general damages at $125,000.00 for seven broken ribs and a broken ankle and special damages *550 for lost wages and past and future medical expenses at $15,655.25, and rendered judgment in accordance with its apportionment of fault.
We find that Cockerham, Dayton and ARCO were all negligent and affirm the trial court's findings regarding the allocations of fault. We further find that the trial court was correct in holding that Order 29-B promulgated by the Department of Conservation in 1974 with the stated effective date of August 1, 1943, was intended to be given retroactive effect.

RETROACTIVITY: STATEWIDE ORDER 29-B

ARCO ASSIGNMENT OF ERROR NO. 1
ARCO contends that the trial court erred when it found that Order 29-B promulgated by the Department of Conservation in 1974 was to be applied retroactively, insofar as it requires the cutting of well casings a minimum of two feet (2') below plow depth. ARCO urges that substantive laws cannot be applied retroactively absent legislative expression to the contrary and that Order 29-B is substantive in that it requires ARCO to perform an obligation it was not required to perform in 1945.
LSA-C.C. art. 6 provides:
In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is legislative expression to the contrary.
Because Order 29-B states an effective date of August 1, 1943 in Section XIII, there is a legislative expression that this law is to apply not only prospectively, but retroactively as well. Thus, there is no need to determine whether the law is substantive or procedural and interpretative.
ARCO further argues that the Commissioner of Conservation exceeded his statutory authority by promulgating Order 29-B, with its attendant 1943 effective date, by requiring ARCO to go back to long abandoned wells and cut them down in accordance with the Order. To support this argument, ARCO cites LSA-R.S. 30:4(C) which gives the Commissioner of Conservation authority to make reasonable rules and regulations regarding the plugging and abandonment of oil wells. ARCO also cites LSA-R.S. 30:4(D)(1)(b) as the provision limiting the Commissioner's authority to "owners" defined by LSA-R.S. 30:3(8) as "... the person who has the right to drill into and to produce from a pool and to appropriate either for himself or for others." ARCO is incorrect in citing 30:4(D)(1)(b) as authority for limiting the Commissioner's authority to "owners" since that subsection only applies to, "... wells; ... which are constructed on state water bottoms pursuant to the grant of a right-of-way by the secretary of the Department of Natural Resources...." Clearly, this well casing is not on a state water bottom. However, LSA-R.S. 30:4(C)(1)(b) does limit the Commissioner's authority to owners where it states:
Only an owner as defined in R.S. 30:3(8) shall be held or deemed responsible for the performance of any actions required by the commissioner.
ARCO relies on the fact that it was and is no longer an "owner" as defined by 30:3(8) in 1974 when Order 29-B was promulgated and in 1990 when the accident occurred. This reliance is misplaced where the effective date of the Order specifically stated August 1, 1943. ARCO's predecessor in title, Sinclair-Prairie Oil Company, was the owner in 1943; thus, ARCO was obligated to go back to Webb Well and cut the casing at least two feet (2') below plow depth. The trial court was not in error in holding ARCO responsible for noncompliance with Order 29-B.

FAULT OF ARCO

ARCO: ASSIGNMENT OF ERRORS NOS. 2 AND 3
ARCO further contends that the trial court erred when it found it negligent in failing to cut the well casing two feet (2') below the plow depth either on the theory of strict liability, LSA-C.C. art. 2317, or ordinary negligence, LSA-C.C. arts. 2315, 2316 because Cockerham failed to prove the element of "custody."
*551 ARCO is incorrect in its statement that both theories of liability require that ARCO have custody of the well casing. Only if ARCO is to be held strictly liable must the element of custody and control be proved by Cockerham. The district court found that ARCO was liable under the ordinary negligence theory. Because we agree, we need not address whether ARCO was responsible under a strict liability theory.
LSA-C.C. art. 2315 provides in pertinent part:
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
LSA-C.C. art. 2316 provides:
Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.
To recover under either of these articles, the duty/risk analysis guides our efforts in making this determination. Such analysis requires the court to take into account the conduct of each party and the peculiar circumstances of the case. A plaintiff must prove: (1) the conduct complained of was a cause-in-fact of the accident; (2) the defendant had a duty to protect the plaintiff against the harm complained of; (3) the defendant breached that duty; and, (4) the plaintiff was harmed by this breach of duty. Holt v. Rapides Parish Police Jury, 574 So.2d 525 (La.App. 3d Cir.1991), Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). The district court found ARCO responsible under a negligence theory because ARCO failed to comply with Order 29-B which required ARCO to cut the well casing at least two feet (2') below plow depth. The purpose of this provision was to prevent injury to person and property. Applying the duty/risk analysis to the facts of this case leads us to the threshold question of whether ARCO's failure to cut the well casing to at least two feet (2') below the plow depth was a cause-in-fact of the accident.
ARCO argues that Cockerham failed to prove the first element of the duty/risk analysis, that ARCO's failure to cut the well casing two feet (2') below plow depth was a cause-in-fact of her injuries. An act or omission is a cause-in-fact of harm to another if it was a substantial factor in bringing about the harm. Socorro, supra at 939. Holt, supra at 528. Factors which may be considered in determining whether the actor's negligent conduct is a substantial factor include whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of harm. Trahan v. State Department of Transportation and Development, 536 So.2d 1269 (La.App. 3d Cir.1988). This court in Trahan, supra, quoting the Supreme Court case of LeJeune v. Allstate Insurance Co., 365 So.2d 471 (La.1978) stated the "substantial factor" test as:
"The `substantial factor' test is akin to the `but for' test (i.e. the accident would not have happened but for the defendant's negligence), except where more than one party's negligence would have caused the accident absent the other party's negligence,.... LeJeune, supra, holds both to be causative ... the `but for' test, ... while it explains the greater number of cases, does not serve as an adequate test for the present situation: `If two causes occur to bring about an event, and either one of them, operating alone, would have been sufficient to cause the identical result, some other test is needed....' In such cases it is quite clear that each cause has in fact played so important a role in producing the result that responsibility should be imposed upon it; and it is equally clear that neither can be absolved from that responsibility upon the ground that the identical harm would have occurred without it, or there would be no liability at all."
Under the facts and circumstances of this case, the conduct of both defendants, ARCO and Dayton, were substantial factors in bringing about Cockerham's injury. ARCO's conduct was a substantial factor because it created an unreasonable risk of harm in failing to cut down the protruding well casing. The duty to cut the well casing *552 two feet (2') below the plow depth was stated in the Commissioner's Order 29-B which, we have previously said, applied to ARCO, thus satisfying the second duty/risk element. After evaluating the relationship between ARCO's duty and the risk involved in the present case, we find Cockerham's actions were within the scope of ARCO's duty.
Since ARCO continues to produce from other wells, it is reasonable to infer that it should have been aware of any Commissioner of Conservation Orders which may be promulgated from time to time. For these reasons, ARCO knew or should have known of the dangerous situation and, therefore, it breached its duty to Cockerham. This court in, Rochelle v. State through DOTD, 570 So.2d 13 (La. App. 3d Cir.1990) stated:
"... Negligence is only actionable where it is both a cause in fact of the injury and a legal cause of the injury. Legal cause requires a proximate relation between the actions of a defendant and the harm which occurs and such relation must be substantial in character."
Applying the "but-for" test to the present case, we agree with the trial court that ARCO's negligence was a cause-in-fact of the accident. The accident would not have happened if there had not been a substantial protrusion of the Webb Well casing on an otherwise flat pasture. Further, there is a substantial relationship between the failure to correct a substantial well casing protrusion in a pasture used to farm and a vehicular accident and the risk encountered by Cockerham. Therefore, we affirm the trial court's finding of ARCO's negligence.

FAULT OF DAYTON
This accident occurred when Dayton inadvertently drove his four-wheeler over the Webb Well casing protruding from the ground as he continued to cross the Taylor property after avoiding a previous protruding well casing. The trial court found that he was negligent in both riding the four wheeler in the misty, dark, and foggy weather conditions and in failing to see what he should have seen. We agree.
As we noted in Rochelle, supra at 16:
"A motorist owes the duty of reasonable care which includes the additional duties of keeping his vehicle under control and maintaining a proper lookout for hazards...."
The facts and circumstances presented in this case lead us to the conclusion that the trial court did not clearly err in finding Dayton at fault.

FAULT OF COCKERHAM (PLAINTIFF)
ARCO argues that Cockerham should be assessed a greater percentage of fault because she assumed the risk or was grossly negligent in riding as a passenger on a four-wheeler. Cockerham argues that she was not negligent simply because she rode as a passenger on a vehicle meant for one person and relies on the second circuit case of Dowe v. Grady, 540 So.2d 1040 (La.App. 2d Cir.1989) where that court held that a passenger who was injured while riding on a three-wheeler in violation of a statute prohibiting two-to-a-seat riding was not negligent per se.
The defendant's argument that Cockerham assumed the risk is clearly without merit. It has been well settled in Louisiana since the 1988 Supreme Court decision of Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988) that the doctrine of assumption of the risk as a defense, formerly a bar to recovery in such cases, has been subsumed into the comparative fault system. Thus, Cockerham's taking the risk of riding as a passenger on a vehicle meant for one person in the evening during inclement weather could no longer bar her recovery but should rather reduce it on a percentage-fault basis. See, Socorro, supra at 941.
A person owes the duty of reasonable care to prevent injuries to himself or herself. As stated earlier, each case must be decided upon its own facts and circumstances. The issue presented in Dowe, supra, was whether the plaintiff was negligent per se in violating a statute, not whether the plaintiff contributed to his *553 own injuries. Therefore, the Dowe decision is not dispositive on the issue of Cockerham's comparative negligence.
The risk of falling off of a four wheel, all-terrain vehicle meant for use by one person while riding as a passenger across a pasture damp with drizzling rain during the evening, is easily associated with Cockerham's duty to ascertain the prudence of her actions in agreeing to ride on the vehicle under those conditions. We conclude that Cockerham was negligent because she knew or should have known of the risks she encountered riding under the inclement weather conditions on a four wheeler as a passenger and she failed to take reasonable steps to prevent her injury. Thus, we find that the trial court was not clearly wrong in assessing some fault to Cockerham.

APPORTIONMENT OF FAULT

ARCO ASSIGNMENT OF ERROR NO. 4

COCKERHAM'S ERRORS A, B AND C
Because Cockerham was partially at fault for her injuries, she is entitled to recover her damages diminished by a percentage thereof corresponding to her portion of comparative fault. Since the Louisiana legislature's adoption of a comparative fault system by Acts 1979, No. 431 (effective August 1, 1980), it has been the task of the factfinder to allocate shares of negligence. Socorro, supra at 942; LSA-C.C. art. 2323. In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 973 (La.1985), the Supreme Court adopted section 2(b) of the Uniform Comparative Fault Act which states:
"[i]n determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed."
In Socorro, the Supreme Court, continuing to quote Watson, supra, set forth several factors which may influence the respective degrees of fault:
"In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties."
Because each of these factors which may influence the respective degrees of fault are factual considerations, the manifest error/clearly wrong standard applies. The percentage allocation of fault in a comparative negligence case is a question of fact and as in any other question of fact, it should not be disturbed in the absence of manifest error. Socorro, supra at 942, Rochelle, supra at 17.
In applying the factors as set forth in Socorro and Watson to assess the nature of the conduct of each party, we find that the trial court was not clearly wrong nor did it commit manifest error in its allocation of fault for the following reasons.
The evidence shows that ARCO failed to cut the well casing at least two feet (2') below the plow depth although, by Order 29-B promulgated in 1974 with an effective date of August 1, 1943, it was mandated to do so. Since there was no evidence that there was any other object protruding from the ground in the vicinity of the accident, clearly the accident would not have occurred at that point had the well casing been cut in accordance with Order 29-B. Thus, we cannot say it would have been clearly erroneous for the trial court to find ARCO forty-five percent at fault.
The evidence further shows that Dayton failed to see what he should have seen. Dayton proceeded to go across the Taylor property without specific permission to do *554 so during weather that presented low visibility conditions at 7:00 p.m. Dayton testified that he was aware of one protruding well casing which he was able to avoid hitting. This should have put Dayton on notice of the possibility of encountering another protruding well casing in the area yet, he failed to make a proper inspection upon proceeding across the Taylor pasture. Had Dayton kept a proper lookout, he would have avoided the Webb well casing as well. Therefore, the trial court was not in error in assessing Dayton with forty-five percent of the fault.
The evidence also shows that Cockerham was traveling as a passenger on a vehicle meant for one person across a pasture on a foggy February evening. The pasture was wet because of rainy weather. Although she was not driving,
"[a]ny person is required by law to recognize that his conduct involves a risk of causing harm to himself if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have." Socorro at 942.
The duty to recognize and take reasonable precautions to prevent harm to oneself is especially applicable to the inherently dangerous activity of riding on a four wheel all-terrain vehicle as a passenger when the vehicle is only meant for one person. A comparison of the respective degrees of causation regarding each party's breach of their respective duties supports the district court's conclusion in assigning ten percent of fault to Cockerham under these facts.

QUANTUM
By its fifth assignment of error ARCO urges the trial court was clearly wrong in awarding excessive damages. It argues that Cockerham's damages for pain and suffering and permanent disability should not exceed $50,000.00. ARCO bases this last argument on the deposition testimony of Dr. Ronny S. Gregg (Dr. Gregg), Cockerham's treating physician, and Dr. Robert T. Van Uden, Jr. (Dr. Van Uden), an orthopedic surgeon whom she saw for evaluation purposes at the request of her attorney.
The thrust of ARCO's argument on appeal is that the testimony of Dr. Gregg, as Cockerham's treating physician, pertaining to her prognosis, should have been accorded greater weight than the medical testimony of Dr. Van Uden, the orthopedic surgeon who saw her twice for evaluation purposes.
Dr. Gregg testified that plaintiff got a good result but it is well understood that problems may develop down the road. Dr. Gregg also felt that Cockerham was not going to have a measurable amount of permanent disability and any limitations on her activities was a subjective matter. When questioned as to Cockerham's sincerity, Dr. Gregg, who sees and works with Cockerham at the Riverlands Medical Center, testified that she is a very sincere person.
Dr. Van Uden concluded from his evaluation of her x-rays that Cockerham had a minimal decrease of her subtalor ankle range, with osteoarthritis which he attributed to the injury. Dr. Van Uden further testified that she had problems flexing her ankle down and moving her heel from side to side. By use of the AMA Guide to Disability Ratings, Dr. Van Uden gave Cockerham a disability rating of sixteen percent of her right ankle based on her limited range of motion. Furthermore, Dr. Van Uden testified that there is a "reasonable likelihood" that she will require future surgery and that the more active she is, the more pain she will experience.
A trial judge has much discretion in the evaluation of and the weight given to the testimony of expert witnesses. Grady Roper Drilling v. Transcontinental, 586 So.2d 707 (La.App. 3d Cir.1991), writ denied, 590 So.2d 592 (La.1992). The weight to be accorded to the testimony of experts depends largely on their qualifications and the facts on which they base their opinions. Durkee v. City of Shreveport, 587 So.2d 722 (La.App. 2d Cir.1991), writ denied, (La.1991). As a general rule, the treating physician's testimony is entitled to greater weight than that of the doctor who *555 examines a claimant for evaluation purposes only, and the testimony of a specialist is entitled to greater weight than that of the general practitioner when the subject at issue involves the particular field of the specialist. Clark v. State Farm Insurance Co., 520 So.2d 860 (La.App. 3d Cir. 1987). In weighing opposing expert opinions, the trier of fact should consider the education and experience of the expert in the particular science or field, the reasons given in support of the opinion, and the other evidence which supports or detracts therefrom. Whittle v. Miller Elec. Mfg. Co., 507 So.2d 266 (La.App. 3d Cir.1987). Our careful review of this record convinces us that the trial judge was not clearly wrong when it accepted the testimony of Dr. Van Uden as to Cockerham's prognosis over that of Dr. Gregg. Dr. Van Uden is an orthopedic surgeon as opposed to Dr. Gregg who is a general surgeon. Moreover, Dr. Gregg's testimony was not clearly in opposition to Dr. Van Uden's. Dr. Gregg merely stated that the pain Cockerham felt and the limitations on her future activities were subjective matters.
In addressing ARCO's assertions of error as to the district court's award of damages, Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976) is instructive:
"We do reemphasize, however, that before a court of appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award.... Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, an then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court... It is never appropriate for a court of appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence."
When damages are insusceptible of precise measurement, much discretion is left to the trial court to assess reasonable damages. LSA-C.C. art. 1999.
We have reviewed the record to see whether it supports an award of $125,000.00 for Cockerham's pain, suffering and permanent disability arising from a fractured right ankle and seven fractured ribs. The trial court stated that Cockerham suffered
"seven broken ribs and a very badly broken ankle. She was hospitalized. She had to remain and have substantial care for several weeks. She had to use crutches and then a walker ... it was several months before she was able to walk without some assistance. She needed assistance at home. Certainly she suffered great pain during that period of time and to the point of trial." (Emphasis added).
The trial court also noted that the injury had limited her activity level, which had previously included many outdoor activities with Dayton such as fishing, hunting and dancing. The trial court finally stated that Cockerham is suffering from arthritis that she did not have before and that it was "quite clear" to the court that her arthritis will continue to get worse until the point that she would lose substantial use of her leg and at this point she has a sixteen percent (16%) disability. The trial court's factual findings are also accorded great discretion, even when they are based on documentary evidence such as medical depositions. Bruno v. Harbert International Inc., 593 So.2d 357 (La.1992). On the whole, considering all the record evidence, we conclude that $125,000.00 general damages for an ankle fracture requiring two surgeries, seven fractured ribs requiring use of a ribbelt, as well as the fact that she now suffers from arthritis with the prognosis of a progressively worsening condition equating to a present 16% disability to that extremity in a physically active woman, is within the trial court's discretionary range.

CONCLUSION
After our review of the record and the reasons for judgment from the trial court, we find that the trial court committed no *556 error in accepting, rejecting or in weighing the conflicting testimony. Thus, the trial court correctly concluded that ARCO was 45% at fault and Dayton was 45% at fault for the accident which led to the injuries suffered by Cockerham. Also, the trial court was correct in its assessment that Cockerham was 10% at fault for causing her own injuries. Furthermore, $125,000.00 general damage award was within the trial court's discretionary range. Accordingly, for the foregoing reasons, the trial court's judgment is affirmed. Costs of this appeal are assessed against the appellants.
AFFIRMED.
STOKER, J., dissents and assigns written reasons.
STOKER, Judge, dissenting.
This case presents no factual disputes. With respect I dissent from the majority's finding of support in law for holding the defendant, Atlantic Richfield Company (ARCO), liable under the circumstances of this case.
While I entertain doubt as to the route by which the majority finds applicable the ordinance promulgated by the Louisiana Department of Conservation, I disagree that the well casing in question presented an unreasonable risk. Consequently, I will not address such questions as whether ARCO could properly be considered an owner long after it had abandoned the well or that the ordinance could be given retroactive effect. Also there is a serious question as to whether the purpose of the ordinance is to protect people and property from injury and damage, or was merely intended to require the return of lands (particularly lands which might be cultivated) to their original state free from obstruction two feet below plow depth.
I am convinced the majority and the trial court incorrectly analyzed the case on the liability issue, even assuming they are correct in the matters mentioned above. The majority opinion purports to perform a duty-risk analysis but goes only so far as to determine that the presence of the casing was a cause in fact of the accident. The majority does not proceed to consider the other steps required for a duty-risk analysis, although it enumerates the other steps which are required.
After finding cause in fact, the majority should have moved to the second step in the duty-risk analysis. It should have asked the question: Was there a duty to protect these particular plaintiffs from the type of harm encountered by the presence of the casing? Roberts v. Benoit, 605 So.2d 1032 (La.1992). See also, LeJeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990) and cases cited therein.
In Entrevia v. Hood, 427 So.2d 1146 (La.1983), the Louisiana Supreme Court considered facts somewhat similar to those presented herethe situation where parties without permission went on private property and one of the parties sustained injury through the collapse of steps on an abandoned building. Entrevia considered liability under LSA-C.C. arts. 2317 and 2322 governing strict liability. The majority in the case before us decides ARCO's liability under negligence concepts and pretermits a consideration of strict liability concepts. However, as Entrevia points out, the substantial difference between ordinary negligence and strict liability is the element of knowledge of the risk. The inquiry is the same in determining liability under both theories. In strict liability, if the defendant has custody, the plaintiff is relieved of proving knowledge of the vice (danger) of the thing. Loescher v. Parr, 324 So.2d 441 (La.1975).
Consider the following observations by the supreme court in Entrevia:
"The judicial process involved in deciding whether a risk is unreasonable under Article 2317 is similar to that employed in determining whether a risk is unreasonable in a traditional negligence problem, Hunt v. City Stores Inc., 387 So.2d 585 (La.1980), and in deciding the scope of duty or legal cause under the duty/risk analysis. Hill v. Lundin Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Green, The Causal Relation Issue, 60 Mich.L.Rev. 543, 563 (1962). This is not *557 because strict liability under Article 2317 is equivalent to liability for negligence, but because in both delictual areas the judge is called upon to decide questions of social utility that require him to consider the particular case in terms of moral, social and economic considerations, in the same way that the legislator finds the standards or patterns of utility and morals in the life of the community. B. Cardozo, The Nature of the Judicial Process, at p. 105 (1921); See also, Green, The Causal Relation Issue, 60 Mich.L.Rev. 543 (1962).
"Because of the similarities in these aspects of the negligence and strict liability inquiries, it has been suggested that a useful approach in a case under article 2317 might be to ask the following: If the custodian of the thing is presumed to have knowledge of its condition before plaintiff's injury, would he then have been acting reasonably by maintaining it and exposing others to it? See Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982) (Lemmon, J.); Id. at 501 (Dennis, J. concurring); Cf. Wade, On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 825, 834-35 (1973); Wade, Strict Tort Liability for Manufacturers, 19 S.W.L.J. 5, 15 (1965)."
Considering these principles, I suggest that answering the duty-risk question of the scope of ARCO's duty to the plaintiff in this suit should require a consideration of the risk involved. Pertinent in this respect is the oft-quoted observation of the late Professor Wex Malone that:
"All rules of conduct, irrespective of whether they are the product of a legislature or a part of the fabric of the court made law of negligence, exist for purposes. They are designed to protect some persons under some circumstances against some risks. Seldom does a rule protect every victim against every risk that may befall him, merely because it is shown that the violation of the rule played a part in producing the injury."
Malone, "Ruminatious on Cause-In-Fact", 9 Stan.L.Rev. 60, 73 (1960), as quoted in Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
With these principles in mind, consider the approach taken by the Louisiana Supreme Court in Entrevia, speaking through Justice Dennis. In Entrevia, the building in question was a remote, unoccupied farm house surrounded by a fence and posted with "no trespassing" signs. The supreme court said:
"In the present case, the trial court found that the imperfections existing in the steps that collapsed and injured the plaintiff did not constitute an unreasonable risk of harm to others. Under the circumstances of the case as reflected by the evidence of record, we agree with his judgment.
"The trial court found that the plaintiff entered the premises unlawfully as a trespasser. Although the wholesale immunities from civil responsibility resulting from the common law classification of a person as a trespasser are not recognized by our law, Cates v. Beauregard Electric Inc., 328 So.2d 367 (La.1976), a knowingly unauthorized entry of another's fenced and posted immovable property is legally and morally reprehensible conduct. La.R.S. 14:63. An owner of property has valid economic and privacy interests which our law seeks to protect from intruders such as the plaintiff.
"The building in question was isolated, unproductive, rural property. Owners of such property having little current worth or utility typically are in a poor position to absorb the costs of premises risks and to redistribute them among the community. Laws or rules which tend to impose a burden requiring either the total destruction or high level restoration of obsolescing farm buildings does not seem socially or economically desirable.
"The steps which collapsed were located in the rear of the fenced and posted property, and the property itself was remotely located on a country road. The evidence does not suggest that the property posed any dangers other than those typically associated with a somewhat rundown old farm house. These facts indicate that the magnitude of the risk posed and the gravity of the harm threatened *558 were small in comparison with that of other risks presented by things in our society.
"Accordingly, for the reasons assigned, the judgment of the court of appeal is reversed and the judgment of the trial court is reinstated."
For the same reasons that the trial court and the supreme court found that the steps in Entrevia did not present an unreasonable risk of harm to others, I would find that no unreasonable risk of harm was presented by the oil well casing involved in this case.
Without making any consideration of the scope of protection covered by the risk of the presence of the oil well casing protruding one foot above the ground, the majority concludes that ARCO's liability rests on the fact that ARCO was the "owner" of the casing when the well was abandoned and it was retroactively responsible for failing to comply with the ordinance promulgated by the Commissioner of Conservation in that it did not cut the casing two feet below plow depth. Since the majority holds ARCO as an "owner," it follows that the majority's decision will be a precedent for recovery against any landowner such as the Taylors. The Taylors owned the land in this case on which there were at least two well casings protruding above ground level. (The plaintiff sued the Taylors as owners of the land, who appear to have been dismissed on motion for summary judgment.) If the ordinance in question is directed at owners, then obviously the landowner becomes owner of an oil well casing fixed in the owner's land when it is abandoned by the owner of the well.
In any event, even in the case involving an oil company which conducted drilling operations and a trespasser (Entrevia's characterization), the court according to Entrevia "must consider the moral, social and economic values as well as the ideal of justice in reaching an intelligent and responsible decision." ARCO drilled the well in question in 1944. Thirty years later the Commissioner of Conservation promulgated its requirement of cutting casings two feet below plow depth. The plaintiff in this case went without permission on the Taylors' land for the purpose of scouting a place where she and her companion could hunt rabbits on the next day. Plaintiff rode on a four-wheeler driven by her companion who was familiar with the fact that at least one well protruded above ground on the Taylor property. They opened the fence and proceeded over open ground on February 16, 1990 at approximately 7:00 p.m. The driver, Dayton, could see ten to fifteen yards in front of him using his low beams. He struck the protruding casing in question, which resulted in injury to the plaintiff.
I do not believe the rulethe requirement of the Commissioner of Conservation for cutting off oil well casing two feet below plow depthwas designed to protect from injury persons like plaintiff who go on the land of another without permission and after dark for the purpose of scouting out places to hunt rabbits.
For the reasons given above I respectfully dissent.