664 So.2d 705 (1995)
Bonnie BOUDREAUX, et al., Plaintiffs-Appellants,
v.
S.P. BLANK, et al., Defendants-Appellees.
No. 95-547.
Court of Appeal of Louisiana, Third Circuit.
November 2, 1995.
*706 Bob F. Wright, Lafayette, for Bonnie Boudreaux et al.
Michael Wayne Fontenot, Lafayette, James Houston Morgan III, Baton Rouge, for S.P. Blank et al.
Before THIBODEAUX and WOODARD, JJ., and KNIGHT [*], J. Pro Tem.
WILLIAM N. KNIGHT, Judge Pro Tem.
The issue in this appeal is whether the jury abused its discretion in the assessment of general damage awards to the plaintiffs.

FACTS
On May 16, 1991, Bonnie Boudreaux, Larlaine Carpenter, and Annette Richard were guest passengers in a 1990 Dodge automobile that was being driven by Janelle Benoit, who was traveling south through the intersection of South Pierce Street and Cameron Street under a green light in Lafayette, Louisiana. At about the same time, Sanford P. Blank, who was driving a 1991 Chevrolet Corsica owned by Avis Rent A Car Systems, Inc., was proceeding east on Cameron Street. The automobiles collided at the intersection of South Pierce Street and Cameron Street when Blank ran a red light, striking the *707 Dodge on its right front door where Boudreaux was sitting as a passenger.
On May 14, 1992, Boudreaux, and her husband, Marvin, Carpenter, Benoit, and Richard filed suit against Blank, his automobile liability insurer, California State Automobile Association, and Avis Rent A Car Systems, Inc. Subsequently, Carpenter, Benoit, and Richard settled their claims against the defendants. Also, Pathfinder Insurance Company, Avis Rent A Car Systems, Inc.'s liability insurer, was added to the suit as a proper party defendant and Avis was dismissed from the suit. Before trial, defendants stipulated to liability; therefore, the only issue at trial was the extent of Bonnie's and Marvin's damages.
The case was tried before a jury on May 17 and 19, 1994. The jury awarded Bonnie general damages of $15,500.00; past lost wages of $1,500.00; past medical expenses of $13,000.00; and future medical expenses of $1,500.00. The jury also awarded Marvin $1,000.00 for his loss of consortium claim.
On May 25, 1994, the trial court signed the judgment encompassing the jury's damage awards. In response, Bonnie and Marvin filed a Motion For Judgment Notwithstanding the Verdict on the quantum award, and alternatively, a Motion For a New Trial and for Additur. After a hearing, the trial court denied the Boudreauxs' motions on November 16, 1994.
The Boudreauxs appeal from these two judgments and assert that the jury erred in awarding an inadequate sum of damages.

LAW
Bonnie argues that the jury abused its discretion in awarding only $15,500.00 in general damages for her face, jaw, neck, hip, and back injuries.
Our jurisprudence has consistently held that in the assessment of damages, much discretion is left to the judge or jury, and upon appellate review, such awards will be disturbed only when there has been a clear abuse of discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person was a clear abuse of the "much discretion" of the trier of fact. Youn v. Maritime Overseas Corporation, 623 So.2d 1257 (La.1993). Only after such a determination of an abuse of discretion is a resort to prior awards for similar injuries appropriate. Reck v. Stevens, 373 So.2d 498 (La.1979). At that point, the award will only be disturbed by raising the award to the lowest point which was reasonably within the discretion afforded to the trier of fact. Theriot v. Allstate Insurance Company, 625 So.2d 1337 (La.1993).
In the case sub judice, Bonnie testified that she never suffered from jaw, neck, hip, and back pain and headaches prior to the accident. This was corroborated by her husband, Marvin, and two co-employees, Janelle Benoit, and Larlaine Carpenter. Immediately after the accident, Bonnie was taken by ambulance to Hamilton Hospital in Lafayette, Louisiana. At the emergency room, Bonnie was complaining of right hip and back pain. She was examined by the emergency room doctor who diagnosed her with a right hip contusion. She was also noted to have some microscopic hematuria, which is a little blood in the urine. There was also a question of a small hairline fracture in the interior aspect of the neck off the right femur.
Two days later, Bonnie went to see Dr. Hugh Larriviere, an orthopedic surgeon. After examining her, Dr. Larriviere noted the following: (1) she had a large ecchymosis in the iliac crest on the right side, which is around the belt, that was very tender to touch and very painful; (2) standing on her heels was a painful experience at that time; (3) she had pain in the lower back area; and (4) the St. Patrick's test, which is a cross-legged test, hurt the right side of her back. When Dr. Larriviere saw Bonnie in July, he noted that she continued to have pain in her right hip. Also, Dr. Larriviere referred Bonnie to Dr. de Alvare, a neurologist, for her continued complaints of headaches and neck pains. Additionally, Dr. Larriviere ordered an MRI which revealed that Bonnie had a "L5-S1 small focal midline protrusion of disc material." Dr. Larriviere stated that he explained to Bonnie that since the protrusion at *708 the L5-S1 was not pressing against the nerve root, he would recommend physical therapy and prescribed anti-inflammatory agents. Further, he gave Bonnie epidural cortisone injections in her back for relief of pain in September and October 1991.
At that point, Dr. Larriviere testified that he explained to Bonnie that the pain was something she would have to adjust to and that she could notify him at his office if she had any further symptoms. Dr. Larriviere next saw Bonnie on March 23, 1993, when she complained of back and hip pain. He gave her a prescription for Voltaren, a non-steroidal anti-inflammatory agent, and told her that if she continued to experience pain, to contact his office. At trial, Dr. Larriviere related Bonnie's protruding disc to the accident. Finally, he acknowledged that Bonnie will always have pain in her lower back and that she would have to restrict her activities so that she would not put an abnormal stress on her back.
Bonnie also sought treatment from Dr. Michael Heard, an orthopedic surgeon. Dr. Heard first examined Bonnie on July 23, 1993 and he indicated that she was complaining of neck and back pain. Dr. Heard testified that during this examination, he noted that she had tenderness in the midline, middle neck area, lower neck area, and low back area. Dr. Heard stated that when he pressed on these areas, Bonnie would experience pain. Dr. Heard also ordered a Cat scan which indicated that "the last disc in the spine was bulging, was swelling out towards the spinal cord." He treated Bonnie's complaints of neck and back pain with medication. At trial, Dr. Heard unequivocally testified about Bonnie's back injury:
Well, she didn't have any of these problems before the accident. These developed after the accident. She has had them for three years, and if someone is going to get well, typically with an injury to their spine, soft tissue injury, they're going to get well, most of them within two months. The rest of them shouldthe other five, ten percent, may take six months to twelve months. But when you get over twelve months and you still have pain from an injury, you're probably going to have chronic pain on a permanent, indefinite basis, because the longer it takes to get well, the worse the prognosis.
* * * * * *
Well, she is at risk. The fact that she's still hurting and still has problems three years later, and she has a bulging disc, she is definitely at risk for having additional problems in the future. If the problems remain where she is, no surgery. If the problems get worse, she has more frequent pain, and more radiating pain, and if it's found with additional testing that this bulge has progressed, then you're looking at possible surgery.
As previously stated, Dr. Larriviere referred Bonnie to Dr. de Alvare for her neck and back pains. After Dr. de Alvare examined Bonnie, he referred her to Dr. Phillip Witherspoon, an orthodontist.
Dr. Witherspoon first examined Bonnie on December 18, 1991 and he diagnosed her with a "dislocation, a reducing dislocation of the meniscus of the temporomandibular joint" on the right side of her jaw. Dr. Witherspoon's diagnosis was confirmed by a MRI taken on December 30, 1991. He also testified that "it's almost a surety" that Bonnie's TMJ problems were related to the accident. Dr. Witherspoon noted that during his treatment of Bonnie that she complained of face, neck, and shoulder pains and headaches. Dr. Witherspoon took measures to correct Bonnie's TMJ problem by first fitting her with a splint in her mouth that she had to wear 24 hours a day. Bonnie stated that she wore this splint for eight months. Further, Dr. Witherspoon stated that in January 1992, he gave Bonnie two injections in her lateral pterygoid to relieve her pain. In July 1992, Dr. Witherspoon moved into the orthodontic stage of treatment of the TMJ that necessitated that Bonnie's jaws be wired with rubber bands for some period of time. At trial, Dr. Witherspoon noted that Bonnie was still wearing this orthodontic brace; that she still has neck problems and headaches; and that her facial pain is now under control.
At the request of defendants, Bonnie was examined by Dr. James A. Pearce, a dentist, *709 who examined her on June 24, 1992 for litigation purposes. Dr. Pearce stated that she had fascia pain of her cervical paraspinal musculature and had some neck discomfort. Dr. Pearce acknowledged that it is common for a patient to have complaints of pain in the cervical muscles when that person has TMJ problems. Also, Dr. Pearce testified that Bonnie had some "fine to medium" crepitus in both temporomandibular joints and further admitted that this is not unusual when there has been an injury in the joint. Finally, Dr. Pearce recommended that Bonnie continue with her orthodontic treatment with Dr. Witherspoon.
Also, at the request of defendants, Bonnie was examined by Dr. James McDaniel, an orthopedic surgeon, for litigation purposes. Dr. McDaniel examined Bonnie for fifteen minutes and reviewed her x-rays and MRIs. Dr. McDaniel diagnosed that Bonnie had a slight loss of water content and mild bulging at the L5-S1 disc area. However, Dr. McDaniel noted that this disc bulge would not cause Bonnie any physical problems.
At trial, Bonnie unequivocally testified that she is still suffering from headaches and pain in her lower back and neck. She revealed that she is taking Darvocet, for pain, and Feldene, for inflammation, to relieve her back pain. Bonnie further stated that the splint therapy and orthodontic treatment with Dr. Witherspoon was very painful. She also indicated that when Dr. Witherspoon would tighten her braces every two weeks, she would experience pain that would prevent her from eating for about three to four days. Bonnie testified that she works for the Lafayette Parish Sheriff's Tax Department doing clerical work. She stated that she has been able to perform her job, but not pain free. Bonnie testified that before the accident, she did a lot of things with her kids and husband such as fishing, bowling, dancing, and working with the horses and cows on their small farm. However, Bonnie stated that after the accident, she can no longer participate in any of these activities. As a result, Bonnie indicated that there had been a "strain" on the family since the accident.
We conclude that the jury abused its discretion in only awarding Bonnie $15,500.00 in general damages for her injuries. As such, we will now review prior awards for similar injuries to determine the appropriate award. Reck, supra.
After a thorough review, we find that the lowest possible award that was reasonably within the discretion afforded to the jury is $60,000.00. See Smith v. Flotation Services, Inc., 596 So.2d 343 (La.App. 3 Cir.1992) ($30,000.00 for a bulging disc with no impingement on the nerves or spine); ANMAC Foundation v. St. Patrick Hospital, 594 So.2d 951 (La.App. 3 Cir.1992) ($27,000.00 for bulging disc at C-5-6 with slight pressure on the nerves; headaches; neck and back pain; and can no longer participate in recreational activities); Thomas v. K-Mart Corporation, 525 So.2d 24 (La.App 3 Cir.), writ denied, 525 So.2d 1045 (La.1988) ($25,000.00 for bulging disc at L-5 S-1 with nerve impingement; permanent condition and will cause pain intermittently); Waller v. Wal-Mart Stores, Inc., 563 So.2d 1346 (La.App. 4 Cir.), writ denied, 568 So.2d 1059 (La.1990) ($25,000.00 for minor bulge at L5 S1; no need for future surgery; chronic pain for four years); and Breaux v. Maturin, 619 So.2d 174 (La.App. 3 Cir.1993) ($20,000.00 for TMJ that was treated for 2 years by two dentists, an orthodontist, and a chiropractor); Wyble v. Allstate Insurance Company, 581 So.2d 325 (La.App. 3 Cir.1991) ($25,000.00 for TMJ with 6 to 9 months of splint therapy; neck, jaw, and ear pain); Maloney v. State Farm Insurance Company, 583 So.2d 12 (La.App. 4 Cir.), writ denied, 586 So.2d 544 (La.1991) ($30,000.00 for TMJ with orthopedic appliance on lower teeth for 6 months; headaches; neck and back pain). Thus, we raise Bonnie's general damage award from $15,500.00 to $60,000.00
Marvin also argues that the jury abused its discretion in awarding $1,000 for his loss of consortium claims. A claim for loss of consortium is broken down into several components, including: (1) loss of love and affection; (2) companionship; (3) sexual relations; (4) the right of performance of material services; (5) the right of support from the spouse; (6) aid and assistance; and (7) loss *710 of felicity. Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144 (La.App. 3 Cir.), writ denied, 565 So.2d 450 (La.1990). Proof of any of these elements is sufficient for an award of consortium. Whitaker v. Mullinax, 628 So.2d 222 (La.App. 2 Cir.1993), writ denied, 94-0382 (La. 3/25/94); 635 So.2d 241.
In the case sub judice, Marvin gave the following undisputed testimony concerning his loss of consortium claim:
Q. Mr. Boudreaux, describe for the jury, if you will, how Bonnie has done physically since the accident?
A. Since the accident?
Q. Yes.
A. Outside activities, you know, what we used to do, we don't do anymore. We don't fish anymore, we don't bowl anymore. She doesn't fool around with the animals because any kind of jolt or something, you know, might hurt her back, so she doesn't fool with the animals anymore. She doesn't take part in any outside activities at all. You know, it's completely different. It's not what our life used to be.
Q. What about her activities about the home, inside the house?
A. She still does a little bit of housework, but the mopping and picking up clothes, you know, bringing them from the utility room and back to be folded and stuff, I'll do all of that now. I do most of the sweeping, most of the vacuuming. I cook somewhat, and then, you know, if we have a pot in the oven, and she's cooking, she can't take the pot out of the oven. I have to take it out of the oven because, you know, it puts her in a position where she could strain her back and stuff. So I do most of that now. She does minor things around the house, but not what she used to do. Waxing the floors and all that, I do all that now.
Q. Has it affected your marital relationship to any extent?
A. Well, we're a close knit family, and you know, she was going through a lot of pain and stuff, and you know, we sympathized with her and we made things do as best we could, you know. But you know, it did change, you know, around the house and stuff, you know. The kids and us, you know. It did change us somewhat. Because she hasn't been the same since the accident.
We conclude that the jury abused its discretion in only awarding Marvin $1,000.00 for his loss of consortium. As such, we will review prior awards for similar injuries to determine the appropriate award. Reck, supra.
After a thorough review, we find that the lowest possible award that was reasonably within the discretion of the jury was $5,000.00. See Henry v. National Union Fire Insurance Company, 542 So.2d 102 (La. App. 1 Cir.), writs denied, 544 So.2d 405 (La.1989) ($5,000.00 to husband whose wife sustained a bulge at C5 C6 level that caused her to be unable to engage in various household and recreational activities); Bacle v. Wade, 607 So.2d 927 (La.App. 2 Cir.1992) ($5,000 to wife whose husband suffered ankle fracture and small protrusions at L4-5 and L5 S1 and was unable to go hunting and dancing with her); Simar v. NOWCAM Services, 617 So.2d 164 (La.App. 3 Cir.1993) ($5,000.00 to wife whose husband suffered soft tissue injuries and chronic pain and could no longer enjoy recreational activities or perform household chores). Thus, we raise Marvin's award from $1,000.00 to $5,000.00.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed in so far as the general damage awards to Bonnie and Marvin. It is adjudged, decreed, and ordered that Bonnie be awarded $60,000.00 in general damages and that Marvin be awarded $5,000.00 for his loss of consortium. In all other aspects, the judgment of the trial court is affirmed. Costs of this appeal are assessed against the defendants.
REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.
NOTES
[*] Judge William N. Knight of the Thirty-first Judicial District participates in this decision as judge Pro Tempore by appointment of the Louisiana Supreme Court.