680 So.2d 1218 (1996)
Larry D. HOLLIE, et ux., Plaintiffs-Appellants,
v.
BEAUREGARD PARISH POLICE JURY, et al., Defendants-Appellees.
No. 96-198.
Court of Appeal of Louisiana, Third Circuit.
August 28, 1996.
Rehearing Denied October 25, 1996.
*1220 Larry A. Roach, Lake Charles, for Larry D. Hollie, et ux.
Henry Gregory Walker Jr., Shreveport, for Beauregard Parish Police Jury, et al.
Alvin Bardine King, Lake Charles, for Vickie L. Hollie.
David Ramsey Lestage, DeRidder, for Bolivar Bishop, Sheriff.
Before KNOLL, THIBODEAUX and DECUIR, JJ.
THIBODEAUX, Judge.
Larry D. Hollie and his now former wife, Vickie Hollie, filed a personal injury suit against the Beauregard Parish Police Jury to recover damages resulting from injuries Mr. Hollie received when he fell from a dump truck while attempting to loosen hardened asphalt from the bed of the truck. The trial court awarded Mr. Hollie $225,000.00 for past, present and future pain and suffering; $87,907.00 for loss of past and future earnings, and $15,000.00 for future medical expenses. Also, the trial court awarded Ms. Hollie $7,500.00 for her loss of consortium. It is from this judgment that the Hollies appeal asserting that the damage awards were inadequate. Beauregard Parish answered the Hollies' appeal and questioned the trial court's apportionment of fault and award of damages to the Hollies.
We affirm for the following reasons.

I.

ISSUES
The issues presented on appeal are whether the trial court erred in: (1) its apportionment of fault; (2) its award for Mr. Hollie's general damages, loss of earnings and future medical expenses; and, (3) awarding Ms. Hollie damages for her loss of consortium.

II.

FACTS
The facts of this case are virtually undisputed. On October 20, 1986, while a trustee at the Beauregard Parish jail, Hollie agreed to perform work outside of the jail environment. Melvin Manuel, a parish employee, instructed Phil Burgess, another parish employee, and Hollie to go to Camp Edgewood Road in a parish-owned dump truck. The truck was loaded with hot-mix asphalt which was to be used to fill potholes. The hot-mix asphalt was loaded on the truck at approximately 8:00 a.m., but was not used until noon. The hot-mix asphalt had begun to harden by the time Burgess and Hollie reached their destination. Further, diesel fuel had not been sprayed on the truck bed to aid in off-loading the asphalt prior to loading the asphalt in the truck bed.
Hollie and Burgess took turns getting into the tilted truck bed to "chop" and loosen the asphalt, forcing the already hardened asphalt out of the truck, and shoveling it into the potholes. The truck bed of the dump truck was tilted at about a 45-degree angle to aid in the removal of the hot-mix asphalt. After all of the potholes in an area were filled, Burgess would drive the truck to another area of potholes. Burgess and Hollie would repeat the process.
During one of Hollie's turns in the dump truck bed, the load of asphalt shifted, causing Hollie to lose his balance and fall backward out of the truck onto the road. Hollie landed on the small of his back and hips. A passerby, Ezra Daugherty, drove Hollie to the De-Quincy Memorial Hospital where he was seen by Dr. A. Romero. Hollie was x-rayed, given a shot for pain, sent back to the Beauregard Parish jail and confined in a holding cell. Hollie continued with complaints of pain and was taken to Beauregard Memorial Hospital on October 24th. At the DeRidder Hospital, he was seen by Dr. Flynn A. Taylor. Hollie was diagnosed with lumbosacral strain and disc abnormality and discharged on November 17, 1986. Hollie continued to complain of problems with his urine retention, bladder, as well as his back.
*1221 In March of 1987, Hollie underwent a decompressive laminectomy with disc excision surgical procedure as well as a posterior lateral spine fusion at L5 and S1, and posterior inner body fusion with the application of VSP plates at Byrd Memorial Hospital in Leesville. Hollie claimed that he suffered continuing bladder problems and sexual dysfunction that led to implantation of an Alpha I Prosthesis (a penile implant) to remedy the sexual dysfunction.
The trial court concluded that Beauregard Parish was 80% at fault for Hollie's injuries with Hollie being 20% at fault for causing his own injuries. This appeal followed.

III.

LAW AND DISCUSSION

Apportionment of Fault
Beauregard Parish argues that the trial court should have assessed Hollie a greater percentage of fault for contributing to his own injuries because the fall was a result of Hollie's own carelessness. It notes that Hollie chose to perform the manual labor and was happy to get outside. Further, Beauregard Parish notes Hollie's experience spreading asphalt out of truck beds and onto the road to fill potholes.
The trial court determined that Hollie's prior experience in performing the work in question should have given him an understanding of the hazard with which he was confronted. The trial court further opined that, given his experience in the field, Mr. Hollie should have voiced some objection to performing the task in the manner executed. The trial court also concluded that "the volunteer nature of the work does not allow the Parish to disregard the safety of the work environment," and held that Beauregard Parish had an obligation to provide Mr. Hollie with a work environment which would not expose him to an undue risk of harm.
A person owes the duty of reasonable care to prevent injuries to himself. Each case must be decided upon its own facts and circumstances. Cockerham v. Atlantic Richfield Co., 615 So.2d 547 (La.App. 3 Cir.), writ denied, 623 So.2d 1303 (La.1993). Beauregard Parish asserts that the conclusion reached in Fruge v. Trahan, 194 So.2d 478 (La.App. 3 Cir.1967) should be followed by this court as to the parish's liability. We disagree. Fruge, although factually similar, is a precomparative fault case and is not dispositive on the issue of Beauregard Parish's and Hollie's comparative negligence.
Since the Louisiana legislature's adoption of a comparative fault system, it has been the task of the fact finder to allocate shares of negligence. Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), the supreme court stated:
"[i]n determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed."
Id. at 973.
Various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great of a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and, (5) any extenuating circumstances that might require the actor to proceed in haste, without proper thought. A further consideration is the relationship between the fault/negligent conduct and the harm to the plaintiff. Cockerham, 615 So.2d 547. The trial court also noted standards applicable to this particular case as designated by the supreme court in Bridgewater v. State Through Department of Corrections, 434 So.2d 383 (La.1983). Those standards include: (1) the relative knowledge of the danger by the supervising employee and the injured employee; (2) the relative control over the employee's situation and the voluntariness of the employee's actions; (3) the alternatives available to the employee; (4) the obviousness of the danger; and, (5) the relative ability to eliminate danger.
*1222 Because each of these factors that may influence the respective degrees of fault are factual considerations, the manifest error/clearly wrong standard applies. The percentage allocation of fault in a comparative negligence case is also a question of fact and, as in any other question of fact, it should not be disturbed in the absence of manifest error. Socorro, 579 So.2d 931. Applying the factors as set forth above to assess the nature of the conduct of each party, we find that the trial court was not clearly wrong nor did it commit manifest error in its allocation of fault for the following reasons.
Hollie had knowledge of the custom of using diesel fuel to lubricate the truck bed in order to facilitate removal of the asphalt. As a prisoner, alternatives available to him were limited, although he could have said that he did not want to remove the asphalt once it had hardened. The risk of danger apparently was not obvious to either Hollie or the parish employee, Burgess. Burgess, as supervisor over the project, should have had the appropriate knowledge, skill and experience to conduct the project in a safe manner. Compared with Hollie, the parish was in a superior position to eliminate the danger. Once Burgess realized that removal of the asphalt would be difficult due to its hardening, he could have discarded the asphalt.
There is a duty to recognize and take reasonable precautions to prevent harm. A comparison of the respective degrees of causation regarding each party's breach of their respective duties supports the trial court's conclusions in assigning Beauregard Parish with 80% of the fault under these facts.

Quantum

A. General Damages
Hollie urges that the trial court was clearly wrong in awarding inadequate damages. His wife makes the same assertion as to the trial court's award for her loss of consortium. Contrarily, Beauregard Parish urges that the trial court erred in awarding excessive damages.
The standard for an appellate court's review of damages was well established in Reck v. Stevens, 373 So.2d 498 (La.1979) and was confirmed in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Suffice it to say, we will not disturb a trial court's award of damages unless we find that the award constitutes an abuse of the trial court's great discretion. The trial court fully explored the record in its written reasons for judgment and detailed the particular injuries Hollie suffered as well as Ms. Hollie's loss of consortium.
After falling from the truck bed, Hollie was transported to DeQuincy Memorial Hospital where x-rays were taken of his lumbar and cervical spine as well as his skull. The x-rays revealed no abnormalities. On October 24, 1986, upon continued complaints of pain, Hollie was admitted to Beauregard Memorial Hospital by Dr. Flynn Taylor. In consultation with Dr. David Steiner, Dr. Taylor diagnosed Hollie as suffering from lumbosacral strain and L5, S1 disc abnormality. While Hollie was hospitalized, Dr. Steiner performed several diagnostic tests. Results of the myelogram were normal. The CT Scan results suggested a central bulge at the L4-5 disc level. However, the nerve roots appeared to be normal. A discogram revealed that the L5-S1 disc was abnormal and that the L3-4 and L4-5 discs were normal. Dr. Shamieh performed an EMG which test suggested mild radiculopathy. Hollie's treatment was conservative, consisting of the administration of pain medication, muscle relaxants, heat therapy and physical therapy.
Subsequent to his accident but before surgery, Dr. Gerald Litel, a neurosurgeon, examined Hollie. Dr. Litel felt that Hollie did not suffer any neurological deficit that would require back surgery. Dr. Litel recommended continued conservative treatment.
Upon his return to jail, Hollie began complaining of his inability to control his urine. Hollie's urinary problem became unmanageable in jail so he was sent back to the hospital under the care of Dr. Taylor. During this period, he continued to suffer leg and back pain. Eventually Dr. Steiner recommended, solely upon Hollie's complaints of pain, surgical intervention to stabilize the abnormal disc by fusion of the L5-S1 disc. The fusion surgery was performed on March 3, 1987.
*1223 After the surgery, Hollie complained of continuing pain. However, Dr. Steiner testified that the pain was considerably less than the pre-surgery pain.
Dr. Steiner continued to follow Hollie's progress for the next two to three years. X-rays conducted on July 7, 1988 revealed that the fusion was solid. Dr. Steiner testified that Hollie felt significantly better post-surgery. However, the doctor noted a significant foot drop on the left. After undergoing psychological evaluations, Hollie's complaints of pain were deemed genuine. However, Dr. Edward Phillips, an orthopedic surgeon who saw Hollie at Dr. Taylor's request, was of the opinion that Hollie was exaggerating his physical discomfort on several tests he performed during his examination.
Hollie also sought treatment from Dr. Charles Williams, a urologist specializing in male sexual dysfunction. Hollie complained that he had problems maintaining an erection. Dr. Williams prescribed medication to slow what the doctor described as Hollie's extremely rapid ejaculation. When Hollie returned for his second visit with Dr. Williams on May 5, 1991, accompanied by a friend who had undergone penile implant surgery, he confessed to the doctor that he was totally impotent and could not achieve an erection at all. Hollie requested a penile implant. Dr. Williams relied on the medical history as provided to him by Hollie in his decision to schedule the surgical procedure. Interestingly, Dr. Williams never reviewed any of Hollie's past medical records nor did he consult with any of Hollie's previous physicians to verify Hollie's condition. Within two weeks after his May, 1991 appointment, Hollie received his penile implant. Had Dr. Williams consulted with Dr. Reed Fontenot, Jr., a urologist who previously examined Hollie, Dr. Williams would have discovered that nothing supported Hollie's complaints of bladder problems or impotence.
Although Hollie describes Ms. Melba Thornton as a disgruntled ex-girlfriend, Ms. Thornton testified that, as the owner of a lounge, she became acquainted with Hollie in July of 1993, when she hired him as a bartender. She described his duties as sweeping, mopping, emptying trash and stocking beer boxes. Ms. Thornton further testified that Hollie never complained of pain while performing his duties. Thornton also testified that she and Hollie had sexual intercourse regularly and was unaware that he had a penile implant. The additional testimony of Dr. Donald Harper, a neurologist specializing in pain management, reveals that Hollie complained of neck and shoulder pain when he saw him on June 20, 1991. However, Hollie never told any of his doctors who saw him immediately following his accident about neck and/or shoulder pain. After carefully reviewing the record, we find that the trial court did not abuse its discretion in assessing general damages of $225,000.00.

B. Past and Future Loss of Earnings
Next, Hollie asserts that this court should increase the amount awarded for past and future loss of earnings. The trial court awarded him $87,907.00 for this item of damages. This court's review is limited to a review for abuse of the trial court's great discretion. Youn, 623 So.2d 1257 (La.1993). Damages for loss of past wages are not necessarily limited to a multiplier of the amount earned at the time of injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Loss of past wages can be computed based on the amount the plaintiff would in all probability have been earning at the time of trial. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). It is well established that a loss of future earnings award is not merely based upon the difference between a plaintiff's earnings before and after a disabling injury. Such an award is predicated upon the difference between the plaintiff's earning capacity before and after the disabling injury. Folse, 371 So.2d 1120.
The factors to be considered in determining loss of future income include: (1) the plaintiff's physical condition before and after his injury; (2) his past work record and the consistency thereof; (3) the amount the plaintiff probably would have earned absent the injury complained of; and, (4) the probability that he would have continued to earn wages over the balance of his working life. Odom v. Claiborne Electric Co-op, Inc., 623 *1224 So.2d 217 (La.App. 2 Cir.), writ denied, 629 So.2d 1171 (La.1993).
Dr. Michael Kurth, a professor of economics at McNeese State University, testified on behalf of Hollie. He found that on the average, between the years of 1976 and 1985, Hollie earned $48,540.00 yearly. Dr. Kurth also factored in a 15% fringe benefit which totaled $86,689.00 over that period. Dr. Kurth ultimately concluded that Hollie suffered a loss of past earnings totaling $466,105.00.
Dan Cliffe, a certified public accountant specializing in economic analysis, rebutted Dr. Kurth's findings. Mr. Cliffe looked at Hollie's income history from 1982 to 1986 and calculated his average income at $25,326.00 per year. Using that income figure to compute Hollie's loss from June 21, 1988 (Hollie's release from jail) to the date of trial, Mr. Cliffe concluded that Hollie's loss was $164,822.00.
Awards for loss of future earnings are inherently speculative and insusceptible of precise mathematical certainty. We have discussed above the factors to be considered in determining future loss of earnings. Before his incarceration, Hollie worked in the oil industry as a drilling consultant. He also had carpentry experience. Vocational rehabilitation consultant, Mark Cheairs, testified that he obtained Hollie's medical history, work history, current vocational status and educational background information. Mr. Cheairs also conducted a vocational evaluation before he formulated a conclusion about Hollie's employability. Mr. Cheairs opined that Hollie's work as a drilling consultant and tool pusher would fall into the light-duty category.
Dr. Thomas Ford, an orthopedic surgeon, estimated Hollie's permanent partial physical impairment at 30% of his body as a whole. Dr. Ford did not determine Hollie to be disabled; He was impaired. Further, Dr. Ford felt that Hollie was capable of work that did not require repeated stooping, bending, or lifting more than 25 pounds. Dr. Steiner also testified as to Hollie's physical abilities. Dr. Steiner concluded that Hollie should be limited to light-duty types of activities. He felt that Hollie's condition would stay about the same for the rest of his life.
Mr. Cliffe, in calculating Hollie's loss of future earnings, concluded that as of the date of trial, Hollie had twelve and a half work-life years left. Considering an inflation rate of 2%-5% and a discount rate of 7.855, Mr. Cliffe calculated that, at the midpoint range, Hollie's loss of future earnings, should he be able to obtain employment paying minimum wage, would be $153,070.00. If Hollie can obtain employment paying $9.50 per hour, his loss would, at the low end, be $17,698.00, at the midpoint range, $51,683.00 and at the high end, $55,668.00.
The trial court awarded Hollie the total amount of $87,907.00 for his loss of past and future earnings.
The trial court found that Hollie's expert based his conclusions on facts not supported by the evidence adduced at trial. Specifically, the trial court found that Hollie's earnings never approached the levels used by Dr. Kurth in his calculations. Therefore, the trial court depended upon the testimony of Mr. Cliffe in assessing Hollie's loss of past and future earnings. A trial judge has much discretion in the evaluation of and the weight given to the testimony of expert witnesses. Cockerham, 615 So.2d 547. The facts upon which an expert bases his or her opinion is one factor to consider in determining the weight accorded to that expert's opinion. Further, when the trier of fact weighs opposing expert opinions, consideration should be given to, among other things, evidence that supports or detracts from the expert's opinion. Id.
Our review of this record convinces us that the trial court was not clearly wrong when it accepted the testimony of Mr. Cliffe as to Hollie's loss of past and future earnings. We find no abuse in the trial court's award for loss of past and future earnings.

C. Future Medical Expenses
Hollie contends that his award for future medical expenses should have been more than the $15,000.00 awarded by the trial court. He argues that he will be on pain medication for the rest of his life and will, in *1225 all likelihood, require one additional penile implant surgery. Beauregard Parish asserts that the record supports the trial court's conclusion that Hollie exaggerated the extent of his pain. Beauregard Parish contends, however, that the record does not support the trial court's conclusion that Hollie's future medical expenses will be $15,000.00, therefore; this court should reduce it to zero. We disagree with both positions.
The trial court apparently concluded that Hollie suffered some pain. Dr. Ford opined that Hollie would remain in his present condition for the rest of his life and suffer some pain due to his accident and consequent back surgery. Although Hollie underwent a penile implant surgical procedure, Hollie's medical records do not reflect that his accident caused his impotence. Dr. Williams, who performed the procedure, accepted Hollie's word as to the cause of his impotence.
We find that Hollie is entitled to an award for future medical expenses; however, he must prove that it is more probable than not that the expenses will be incurred. Blanchard v. Means Industries, Inc., 635 So.2d 288 (La.App. 5 Cir.1994). Given Hollie's activity level as revealed by the record as well as his complaints of paintempered with the finding that Hollie has exaggerated some of his complaintswe conclude that Hollie has borne his burden of proving, by a preponderance of the evidence, that he will tolerate some continued pain as a result of his back surgery. He will most likely have to take medications to alleviate the pain. We find that the trial court did not abuse its discretion in awarding Hollie $15,000.00 in damages for future medical expenses.

D. Loss of Consortium
The Hollies argue that Ms. Hollie's award for loss of consortium should be increased. Beauregard Parish disagrees, contending that Hollie's incarceration created a strain on their relationship prior to his accident, injury and surgery. The trial court found that Ms. Hollie was entitled to $7,500.00 for her loss of consortium. We agree.
In Boudreaux v. Blank, 95-547 (La. App. 3 Cir. 11/2/95); 664 So.2d 705; this court listed the components of a claim for loss of consortium as: "(1) loss of love and affection; (2) companionship; (3) sexual relations; (4) the right of performance of material services; (5) the right of support from the spouse; (6) aid and assistance; and (7) loss of felicity." Id. at 709-10. Proof of any one of these components is sufficient for an award of consortium. Whitaker v. Mullinax, 628 So.2d 222 (La.App. 2 Cir.1993), writ denied, 94-0382 (La. 3/25/94); 635 So.2d 241.
In this case, the trial court reasoned:
In connection with Mrs. Hollie's claim for loss of consortium, the Court concludes that the Hollies' marriage was a troubled one before the accident. Mr. Hollie represented himself as being `separated' and `in the process of divorce' to the medical care providers. He was involved with other women and lived with his wife periodically during this period. It is the opinion of the Court that Mrs. Hollie is entitled to some loss of consortium for the period immediately following the surgery on the defendant's [sic] back while they were in a reconciled state....
Ms. Hollie proved several of the components necessary for a loss of consortium claim when she took care of Mr. Hollie following his back surgery. However, due to the already strained relationship between the Hollies because of his philandering and incarceration, we find that the trial court did not abuse its great discretion in awarding Ms. Hollie $7,500.00 on her claim.

IV.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed. Costs at the trial and appellate levels are assessed against the Beauregard Parish Police Jury and its insurer for 80% of $6,637.47, and against the plaintiff, Larry D. Hollie, for 20% of that amount.
AFFIRMED.
THIBODEAUX, J., dissents from Part III(B). The award of $87,907.00 for loss of past and future earnings is an abuse of discretion because of the court's partial reliance *1226 on Mr. Cheairs' tenuous methodology. The award should be increased to $300,000.00.