773 So.2d 831 (2000)
Betty G. Melerine, wife of/and Dwight J. MELERINE
v.
The STATE of Louisiana, The State of Louisiana Through the Department of Natural Resources, The Department of Conservation, Delacroix Corporation, Albert M. Stall and Victor A. Smith.
No. 2000-CA-0162.
Court of Appeal of Louisiana, Fourth Circuit.
November 8, 2000.
Opinion Denying Rehearing January 12, 2001.
*832 Lorna P. Turnage, Glenn E. Diaz, Chalmette, LA, Counsel for Plaintiffs/Appellants.
Richard P. Ieyoub, Attorney General, Gustave A. Manthey, Jr., Assistant Attorney General, Louisiana Department of Justice, New Orleans, LA, Counsel for Defendant/Appellant, State of Louisiana.
Gary P. Kraus, Onebane, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, LA, Counsel for Defendant/Appellant, Victor P. Smith.
Paul A. Bonin, Bonin Law Firm, New Orleans, LA, Counsel for Defendant/Appellant, Albert M. Stall.
(Court composed of Judge JOAN BERNARD ARMSTRONG, Judge STEVEN R. PLOTKIN, Judge MIRIAM G. WALTZER).
PLOTKIN, Judge.
The unique legal issue in this case is the ownership of and liability for an abandoned partially-submerged oil well casing located on a navigable waterway in State waters.
Defendants Albert M. Stall, Victor P. Smith, and the State of Louisiana appeal a trial court judgment awarding plaintiff Dwight J. Melerine a total of $436,144.32 for damages he sustained when his fishing boat struck an abandoned oil well casing. Melerine and his wife, Betty G. Melerine, appeal the trial court's calculation of interest, as well as the apportionment of damages on a joint and several basis.[1]

I. FACTS
Melerine claims that he suffered permanent injury to his back and damage to his *833 vessel on September 15, 1994, when his fishing boat, F/V SHELLEY CRAIG, which he was operating, struck an abandoned submerged oil well casing located near the entrance to Pumpkin Bay, east of Bayou Terre Aux Beouf, in St. Bernard Parish. Stall and Smith obtained State Lease No. 3938 and permits from the Louisiana Department of Conservation and U.S. Army Corps of Engineers. The oil platform and well was drilled in 1963 by defendants, Stall and Smith, on water bottom land owned by defendant, the State of Louisiana. The well, which was dry, was plugged and abandoned according to the regulations of the Louisiana Department of Conservation, on May 18, 1964. Thereafter, the lease terminated and the land was released to the State of Louisiana.
The Melerines filed an admiralty or general maritime law claim in state court pursuant to the Savings to Suiters clause against Stall, Smith, Delacroix Corporation and the State, seeking recovery for Melerine's injuries, for damages to the boat, and for Mrs. Melerine's loss of consortium. Prior to trial, Delacroix Corporation was dismissed from the suit on a motion for summary judgment. At trial, on the motion of defendant Stall, the trial court dismissed Mrs. Melerine's loss of consortium claim, finding that it was impermissible under general maritime law.
Following a trial of the matter, the trial court held that the defendants were liable for Melerine's injuries, and apportioned fault 40 percent to Stall and Smith, 40 percent to the State, and 20 percent to Melerine. All defendants filed motions for new trial, or alternatively, to amend the judgment. The trial court amended the judgment to distinguish between past and future wage losses, to award prejudgment judicial interest on all past losses, to award postjudgment judicial interest on all losses, and to specify that the apportionment of damages should be on a joint and several basis. The motions for new trial were denied.
The issues presented by the various appeals that must be decided by this court may be summarized as follows:
1. Liability under the Louisiana Civil Code property articles;
2. Liability under Statewide Order 29-B;
3. Liability under general maritime law;
4. State of Louisiana's immunity from liability;
5. Melerine's comparative negligence;
6. Allocation of fault; and
7. Calculation of interest.

II. LIABILITY UNDER THE LOUISIANA CIVIL CODE
The petition filed by the Melerines in the instant case alleges that the legal cause of their alleged injuries was the negligence of the various defendants. Most of the acts of negligence alleged by the Melerines involve the defendants' failure to take certain actions, particularly failing to remove the abandoned oil well casing. According to La. C.C. art. 2315, Louisiana's general negligence provision, "[a]ny act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." At the time of Melerine's accident, La. C.C. art. 2315 had been consistently interpreted to impose liability both for acts of commission and acts of omission if the duty imposed by the relationship of the parties is breached by such act or omission. Dominici v. Wal-Mart Stores, Inc., 606 So.2d 555, 559 (La.App. 4 Cir.1992).
Although not mentioned by the Melerines or the trial court, but raised by other parties, liability for Melerine's damages, which occurred when his boat struck a fixed object located in a body of water, could be based, in addition to negligence principles, in strict liability principles. The Louisiana Third Circuit Court of Appeal has found that "the term `building' as used in the Civil Code is broad enough to *834 include oil wells." Billiot v. State of Louisiana, 94-1365, p. 4 (La.App. 3 Cir. 4/12/95), 654 So.2d 753, 755, writs denied, 95-1648, 95-1772 (La.11/13/95), 662 So.2d 467. Thus, the following strict liability Civil Code articles apply:
Art. 2317. Acts of others and of things custody
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.
* * * * *
Art. 2322. Damage caused by ruin of building
The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.
In 1990, the primary difference between a negligence action under La. C.C. art. 2315 and a strict liability action under La. C.C. arts. 2317 and 2322 was that the plaintiff in a strict liability action was "relieved of proving knowledge, constructive or otherwise, of the hazardous condition or defect." Morrow v. Sewerage and Water Board, 562 So.2d 1082, 1083 (La.App. 4 Cir.1990). This requirement was removed by the 1996 amendments to La. C.C. art. 2322. However, even in 1990, when the defendant was a public entity and the plaintiff's basis for recovery lay in strict liability, LSA-R.S. 9:2800 required that the plaintiff prove that the defendant had actual or constructive notice of the defect. Id.
The Louisiana Supreme Court most recently interpreted the pre-amendment article governing the strict liability of the owner of premises in Celestine v. Union Oil Co. of California, 94-1868 (La.1995), 652 So.2d 1299 as follows:
An owner's liability for a vice or defect on the premises is rooted in La. C.C. arts. 2317 and 2322. Both articles impose strict liability, or liability without fault, based upon status as an owner or custodian rather than on personal fault. Fonseca v. Marlin Marine Corp., 410 So.2d 674 (La.1981). Under La. C.C. art. 2317, liability is imposed upon an individual as a custodian for damage caused by things in his custody. Loescher v. Parr, 324 So.2d 441 (La. 1975). Under La. C.C. art. 2322, an owner is liable for damages to any person injured in an accident caused by the owner's neglect to repair the building or from a defect in its original construction. Olsen v. Shell Oil Co., 365 So.2d 1285 (La.1978).
To recover under La. C.C. 2317, a plaintiff must prove that he was injured by a thing which was in the care or custody of the defendant and that such thing was defective. Fonseca, supra; Loescher, supra. To recover under La. 2322 against an owner of a building, a plaintiff must prove that the building posed an unreasonable risk of injury to others and that he was damaged by virtue of this risk. Entrevia v. Hood, 427 So.2d 1146 (La.1983).
* * * * *
A building owner is not responsible for all injuries resulting from any risk posed by his building; he is only liable for those injuries caused by an unreasonable risk of harm to others. Entrevia, 427 So.2d at 1149. Likewise, strict liability requires the plaintiff to prove that the vice or defect of the thing is a condition which poses an unreasonable risk of harm to others. Sistler v. Liberty Mutual Insurance Co., 558 So.2d 1106 (La.1990).
Id. at 6-7, 652 So.2d at 1303 (emphasis in original).
Thus, the following elements were necessary in 1990 to a finding of liability arising from ruin of a building: (1) ownership *835 and/or custody of the building; (2) unreasonable risk of injury; and (3) causation. In order to impose liability on a public body, like the State, notice of the unreasonable risk of harm is also necessary.

A. OWNERSHIP AND CUSTODY
Under the above stated principles, the threshold issue that must be decided by this court is ownership and custody of the abandoned oil well casing in question. The trial court's reasons for judgment do not address this issue.
Under the provisions of La. C.C. art. 450, "waters and bottoms of natural navigable water bodies" are "public things" owned by the State of Louisiana. The State leased the water bottom land where the oil well casing was drilled, part of State Lease 3938, to Lujon Oil Co. by agreement dated April 11, 1962. Lujon Oil then gave Stall and Smith permission to drill for oil. Stall and Smith also received a permit from the Army Corps of Engineers and from the State of Louisiana, Department of Conservation. They then entered a turnkey contract with a company called Hawkins & Hawkins to actually drill the oil well. When the oil well was determined to be a dry, it was plugged and abandoned by Stall and Smith's agent, Hawkins & Hawkins, pursuant to the requirements of Statewide Order 29-B, as it existed in 1963. At that time, Order 20-B did not require removal of the oil well casing. The plug and abandon report was dated March 2, 1963.
Predictably, Stall and Smith claim that the State both owned and had custody of the oil well casing at the time of Melerine's accident, while the State claims Stall and Smith both owned and had custody on that date. The Melerines claim essentially that both parties were properly assigned liability because Stall and Smith owned and had custody of the oil well casing, while the State owned and had custody of the land where the oil well casing was located.

1. Ownership of the oil well casing
The importance of the ownership issue in an action under La. C.C. arts. 2317 and 2322 was described in the Louisiana Supreme Court's 1990 opinion in Sistler v. Liberty Mutual Insurance Co., 558 So.2d 1106 (La.1990), as follows:
Legal fault, the first element of the plaintiff's case under articles 2317 and 2322, arises out of the legal relationship between the defendant and the person or thing whose conduct or defect creates an unreasonable risk of injuries to others. The fault of the owner is based upon his failure to prevent the building for which he is responsible from causing such an unreasonable risk of injury to others. Rather than the loss falling upon some innocent third person, the loss resulting from the creation of the risk falls upon the person to whom society allots its care, custody or control (guarde). The rationale is the owner is in a better position than the innocent victim to detect, evaluate and take steps to eliminate an unreasonable risk of harm which arises from the thing.
Id. at 1112 (citations omitted).
Determination of the pivotal ownership issue in this case is controlled by the following Louisiana Civil Code articles, quoted in pertinent part:
Art. 493. Ownership of improvements
Buildings, other constructions permanently attached to the ground, and plantings made on the land of another with his consent belong to him who made them. They belong to the owner of the ground when they are made without his consent.
When the owner of buildings, other constructions permanently attached to the ground, or plantings no longer has the right to keep them on the land of another, he may remove them subject to his obligation to restore the property to its former condition. If he does not remove them within 90 days after written demand, the owner of the land acquires *836 ownership of the improvements and owes nothing to their former owner.
* * * * *
Art. 493.1. Ownership of component parts
Things incorporated in or attached to an immovable so as to become its component parts under Articles 465 and 466 belong to the owner of the immovable.
Art. 493.2. Loss of ownership by accession; claims of former owner
One who has lost the ownership of a thing to the owner of an immovable may have a claim against him or against a third person in accordance with the following provisions.
* * * * *
Art. 495. Things incorporated in, or attached to, an immovable with the consent of the owner of the immovable
One who incorporates in, or attaches to, the immovable of another, with his consent, things that become component parts of the immovable under Articles 465 and 466 may, in the absence of other provisions of law or juridical acts, remove them subject to his obligation of restoring the property to its former condition.
If he does not remove them after demand, the owner of the immovable may have them removed at the expense of the person who made them or elect to keep them and pay, at his option, the current value of the materials and of the workmanship or the enhanced value of the immovable.
A close reading of the above articles reveals that La. C.C. art. 493 applies to one classification of property, while La. C.C. arts. 493.1 through 495 apply to a different classification of property. La. C.C. art. 493 applies to the instant case if the abandoned oil well casing is an "other construction permanently attached to the ground," while La. C.C. arts. 493.2 through 495 apply if the oil well casing is an "integral part" of the ground. See Symeon Symeonides, "Developments in the Law: 1985-86: A Faculty Symposium: Property," 47 La. L.Rev. 429, 449 (Nov.1986). Symeonides summarized the law, as "juxtaposed" between the pertinent Civil Code articles, using terms that would be understood by the "layman landowner," as follows:
If a thing is incorporated into your land in such a way as to become an integral part of it, we call that thing a component part of your land (La. Civ. Code art. 465). This means that the thing is yours, whether or not you consented to its incorporation (La. Civ.Code art. 493.1). If, however, you consented to such incorporation, you may force the person who made it to remove the thing at his expense (La. Civ.Code art. 495), although the thing belongs to you and no longer to him.
On the other hand, if the thing is not so incorporated into your land, but is merely attached to it permanently with your consent, then we do not call that thing a component part of your land (La. Civ.Code arts. 463, 464, 493 par. 1). Obviously, this means that the thing is not yours (La. Civ.Code art. 493 par. 1). Although it is not yours and you may not want to have it, it may somehow become yours, if the person who put it there does not want to remove it (La. Civ.Code art. 493 par. 2 as interpreted in Guzzetta [v. Texas Pipeline Co., 485 So.2d 508 (La.1986)].
Id. at 450-51 (emphasis added). Symeonides then noted that this entire area of the law "resembles a pile of `cans of worms.'" Id.
In Guzzetta, quoted by Symeonides above, the Louisiana Supreme Court considered whether the plaintiffs, owners of immovable property, could recover monetary damages for costs associated with the removal of a pipeline from their property. 485 So.2d 508. The pipeline had been placed on the property in 1955 by the *837 defendant pursuant to a servitude granted either by the plaintiffs or by their ancestors in title. Id. at 509. In 1983, the defendant had discontinued use of the pipeline, but did not remove the pipeline from the plaintiffs' property. Id. The plaintiffs had made demand on the defendant to remove the pipeline, but the defendants failed to do so within 90 days of the demand. Id. The court denied the plaintiffs' request for damages to cover the costs of removing the pipeline, stating as follows: "Louisiana law provides that ownership of an abandoned pipeline reverts to the owner of the land if the owners refuse to remove it within ninety days of demand," and holding that the landowner was the owner of the pipeline and therefore had to bear the cost for its removal. Id. at 510, citing La. C.C. art. 493. The court also found specifically that La. C.C. art. 495 "only applies to things that become component parts of an immovable, and other constructions permanently attached to the ground are not component parts of a tract of land when they belong to a person other than the owner of the ground, as here." Id. at 511. Thus, the court somewhat illogically concluded that the pipeline was not a component part of the land under La. C.C.P. art. 465 because it was not owned by the landowner, then held that it was a construction permanently attached to the ground under La. C.C.P. art. 463, and that the landowner became the owner of the construction when the builder failed to remove it within 90 days of written demand.
Like Guzzetta, this case involves a building or "other construction permanently attached to the ground" rather than an "integral part" of the ground. That conclusion is based both on the similarities between the instant case and Guzzetta, and on the holding of Billiot, that "the term `building' as used in the Civil Code is broad enough to include oil wells." 94-1365 at 4, 654 So.2d at 755. Thus, La. C.C. art. 493 controls the ownership issue presented by this appeal.
Prior to the 1984 amendments to La. C.C. art. 493, the article simply distinguished between buildings permanently attached to the ground with the consent of the owner of the ground, in which case they belong to "him who made them," and buildings permanently attached to the ground without the consent of the owner of the ground, in which case they belong to the landowner. Symeonides, supra, 45 La. L.Rev. at 541. The pre-amendment article was silent concerning the "fate of improvements made with the landowner's consent after such consent terminates." Id. The 1984 amendment, which added the second paragraph of La. C.C. art. 493, was designed to fill that gap. That paragraph allows the landowner to acquire ownership of the building by giving notice demanding removal of the building to the one who made the building. La. C.C. art. 493, par. 2. If the owner of the building fails to remove the building within 30 days of the written notice, the landowner is deemed the owner of the building, without owing anything to the previous owner. Id.
That rule works fine in situations where the landowner wants the building. However, as demonstrated by the Guzzetta case, problems arise when, as in the instant case, neither the landowner nor the person who made the building wants ownership of the building. In that case, La. C.C. art. 493 contains no provision allowing the landowner to force the removal of the building at the expense of the owner of the building; in fact, it provides that the landowner becomes the owner of the building if the one making it does not remove it, whether the landowner wants the building or not. Thus, there remains a gap in the law in this area, as demonstrated by the following quotation from Symeonides:
A "creative" interpretation of article 493 could begin by drawing a distinction between "wanted" and "unwanted" improvements, and then by inquiring whether the article is applicable to both types of improvements. With regard to the first type, i.e., improvements *838 which either both parties or at least one party wants, the answer should be clear and unavoidable: Article 493 would apply on all fours. With regard to the second type, however, i.e., improvements which, as in Guzzetta, neither party wants, the answer would not be as categorical.
Article 493 does not address this question directly. In terms of literal interpretation, one could argue that, since the article does not on its surface distinguish between wanted and unwanted improvements, no such distinction should be made by judicial fiat. Nevertheless, as Guzzetta itself demonstrates, such interpretation may lead to potentially harsh results. It would therefore appear more equitable if the article were interpreted as simply being silent on the question of the removal of improvements which neither party wants.... Although the amendment employed language that is broad enough to encompass unwanted improvements, ... it would be preferable to subject this language to a restrictive interpretation. Such an interpretation would be consistent with the cardinal principle that ownership is presumed free of burdens and would allow the court to focus more closely on the peculiarities of the particular case and to reach a more individualized and equitable approach.
Id. at 451-52.
Despite Symeonides' criticism of the result, the Louisiana Supreme Court's interpretation of La. C.C. art. 493 in Guzzetta remains the last word on the application of the provision to cases such as this one where neither the owner of the building nor the landowner wants the building; as such, it is binding on this court. The instant case is distinguishable from Guzzetta on only one pointthe landowner in this case has never issued notice to the maker of the building demanding its removal. Because La. C.C. art. 493 does not address the situation presented by the instant case, we must apply civilian analogy. See Loescher v. Parr, 324 So.2d 441 (La. 1975).
A close reading of the second paragraph of La. C.C. art. 493 reveals that the article anticipates the occurrence of a time when the maker of a building permanently attached to the ground of another with the landowner's permission "no longer has the right to keep [the building] on the land of another." When that time occurs, such as lease termination or abandonment of the property, the maker of the building is given statutory authority to remove the building "subject to his obligation to restore the property to its former condition."
In Guzzetta, the court found that the time when the defendant no longer had permission to keep the pipeline on the plaintiffs' land was controlled by the servitude agreement between the partiesi.e., when the servitude expired, the defendant no longer had the right to keep the pipeline on the plaintiff's property. See 485 So.2d at 510-11. Although the court noted in that case that the servitude might not yet have expired, it nevertheless found that the plaintiffs' rights were established conclusively when the defendant failed to respond within 90 days of receipt of the demand to remove the pipeline. Id. at 511. The court simply assumed that the defendants would not have responded to a second 90-day notice to remove the pipeline, and found that once the servitude did expire, "C.C. art. 493 would again apply, preventing the plaintiffs from recovering costs of removal or compelling removal." Id. (emphasis added.) The court then stated as follows: "Again, after the failure to remove the pipeline within ninety days of written notice, the ownership of the pipeline would revert to the plaintiffs." Id. (Emphasis added.)
Thus, the general rule governing ownership of buildings permanently attached to land with the landowner's permission by someone other than the landowner arising from La. C.C. art. 493, as interpreted by Guzzetta, is that ownership reverts by operation of law to the landowner *839 when the maker of the building fails to remove it after he no longer has permission to keep it on the landowner's land. Once the permission to keep the building on the land terminates, the failure to remove the building is considered as a matter of law an indication that the maker of the building intends to surrender ownership to the landowner. Thus, reversion of the ownership of the building to the landowner is controlled, not by the landowner's issuance of the 90-day notice to remove, but by the actions of the maker of the building.
This rule makes sense in light of the fact that the second sentence of La. C.C. art. 493 automatically vests ownership in the landowner of buildings permanently attached to land by someone other than the landowner, without the landowner's permission a rule that apparently applies whether or not the landowner wants the building. The only time the maker of a building has any right to remove a building he has attached permanently to the land of another is when the landowner has given him permission to keep the building on his land. However, even that right is limited by the requirement that he remove the building whenever permission to keep the building on the land of another terminates. The person making the building has no rights whatsoever when he permanently attaches a building to the land of another without the landowner's permission. In fact, vesting the landowner with ownership of a building he does not want makes even more sense when the landowner has given his permission for the making of the building than when he has not given permission because he has an opportunity to withhold his permission and thereby prevent the making of the building in the first place. As Symeonides noted: "Although [the building] is not yours and you may not want to have it, it may somehow become yours, if the person who put it there does not want to remove it." 47 La. L.Rev. at 451. This rule is consistent with Louisiana's acquisitive prescription rule providing that ownership of an immovable may be acquired by the prescription of thirty years, even without title or possession in good faith. La. C.C. art. 3486.
In the instant case, the provisions of the lease agreement between the State and Lujon Oil Co. reveal that Stall and Smith's right to keep the oil well casing on the State's property expired long before Melerine's accident. Paragraph 11 of the lease provides as follows: "Lessee shall have the right during or within one year after the life of this lease to remove all Lessee's property and equipment, including the right to draw and remove all casing." The lease agreement, dated April 11, 1962, contained the following provision concerning the term of the lease:
Subject to the other provisions hereof, this lease shall be for a term of Three (3) years from the date hereof (hereinafter called "primary term") and as long thereafter as sulphur, potash, oil, gas or any other liquid or gaseous hydrocarbon mineral is produced hereunder in paying quantities or any operation conducted or payment made or condition exists which continues this lease in force, according to its terms.
Because the well was unsuccessful, the lease expired under the above provision three years from the date it was entered, on April 11, 1965. Under paragraph 11, Smith and Stall then had one yearor until April 11, 1966to remove their property and equipment, "including the right to draw and remove all casing." After that datei.e. April 11, 1966Stall and Smith no longer had the right to keep the oil well casing on the State's property.
Since the permission granted by the State for Stall and Smith to permanently attach the oil well casing to its land terminated in 1966, at the latest, the ownership issue is controlled by Stall and Smith's actions when the right terminated. The record in this case reveals that, even before the permission terminated, Stall and Smith filed a "Plug and Abandon" report with the Stateon March 2, 1963giving *840 notice to the State of their intention to surrender ownership of the oil well casing to the State. Moreover, Stall and Smith made no efforts to remove the oil well casing as allowed by the lease agreement during the one-year period after termination of the lease, but simply plugged and abandoned the oil well as required by the provisions of Statewide Order 29-B, as it existed at the time. When Stall and Smith failed to remove the oil well casing before April 11, 1966, they lost all rights to the oil well casing, both under the lease agreement and under La. C.C. art. 493, as interpreted by Guzzetta. Accordingly, the ownership of the oil well casing reverted to the State almost 30 years before Melerine's accident.

2. Custody of the oil well casing
Although we have found that Stall and Smith did not own the oil well casing struck by Melerine, that does not answer the question of whether they had custody of the oil well casing at the time of Melerine's accident. This court's 1990 decision in Socorro v. Orleans Levee Board, 561 So.2d 739 (La.App. 4 Cir.1990), aff'd in part, rev'd in part on other grounds, 579 So.2d 931 (La.1991), directly addresses the custody issue as follows:
The liability imposed by Civil Code Article 2317 is grounded in the custody or control of a defective thing. For purposes of that article custody means "supervision and control." The term "custody" has its origin in the French term "garde." Colleps v. State Farm General Insurance Co., 446 So.2d 988 (La.App. 3d Cir.1984). The term "custody" has its origin in the French term "garde." Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987). "According to the French understanding, garde is the obligation imposed by law on the proprietor of a thing or on the one who avails himself of it to prevent the thing from causing damages to others." Id. at 1030. Although ownership may indeed evidence the "garde" required for Article 2317, this guardianship may also rest with one who is not the owner. In Loescher v. Parr, 324 So.2d 441, 449 n. 7 (La.1975), the Supreme Court defined Article 2317 "custody:"
The things in one's care are those things to which one bears such a relationship as to have the right of direction and control over them and to draw some kind of benefit from them. This relationship would ordinarily be associated with ownership but the guardianship will also belong to the bailee, the lessee, the usufructuary, the borrower for use and the repairman, among others ... The owner may transfer the guardianship by transferring the thing to another who will bear such relationship to the thing as to himself have the care of it. [Emphasis added.]
As a general rule, however, it can be said that guardianship rests with the owner until it is transferred to another. Jacobs v. Spinnakers, 474 So.2d 1019 (La.App. 5th Cir.1985).
Further, a defendant's "garde" of a thing can form the basis for fault in negligence under a duty-risk analysis, the only difference being the burden of proof. Bush v. Lafayette Insurance Co., 477 So.2d 900 (La.App. 4th Cir.1985).
Id. at 745-46 (emphasis in original).
Applying the above principles to the instant case, it is evident that the State, as owner, had custody of the oil well casing struck by Melerine. Although Stall and Smith might have had custody of the oil well casing during the existence of the lease, the State was the only juridical person that bore "such a relationship as to have the right of direction and control ... and to derive some benefit" from the property at the time of Melerine's accident in 1990. See Socorro, 561 So.2d at 746. Thus, the thing that caused Melerine's damage was owned and in the custody of the State, a fact that satisfies the first *841 element of a cause of action against the State.

B. Unreasonable risk of harm
The second element of a cause of action for liability arising from ruin of a building is evidence that the defective or hazardous condition of the building created an unreasonable risk of injury that resulted in the damage. The reasonableness of the risk is determined by a balancing test, weighing the probability and magnitude of the risk against the utility of the thing. Sistler, 558 So.2d at 1112. The balancing test is not, however, applied in a vacuum, as evidenced by the following quotation included in Celestine:
The phrase "unreasonably dangerous", in the words of Louisiana's late distinguished Professor Wex S. Malone, "has no discernible content of its own and ... must acquire its meaning solely from the environment attendant on each of the variety of disputes in which it is put to use." Unlike the regime of strict products liability, which uses the "ordinary consumer" as its benchmark, Louisiana's scheme of strict liability under Articles 2317 and 2322 posits no constant person or persons, mythical or real, with respect to whom the reasonableness of a given risk is to be measured. For that reason, the Louisiana courts have found themselvesunder the rubric of assessing a risk "under all of the circumstances of a particular case"determining the reasonableness of a given risk "vis-a-vis the plaintiff", or more accurately, vis-a-vis the plaintiff and those similarly situated.
94-1868 at 8, 652 So.2d at 1304, quoting Ladue v. Chevron, USA, Inc., 920 F.2d 272, 277 (5th Cir.1991) (footnotes omitted).
In the instant case, the inquiry into the reasonableness of the risk is simplified by the fact that the abandoned oil well casing had no practical utility. Once the well proved unsuccessful, which occurred virtually the same time that it was drilled, the oil well and the oil well casing served no purpose whatsoever; it was simply the result of an unsuccessful search for natural resources, as allowed by the State's lease of the property for that purpose. On the other hand, the probability and gravity of harm caused by the existence of an unlit, unmarked immovable in navigable waters is relatively high, especially given the evidence in this case that the oil well casing became submerged during an exceptionally high tide. The oil well casing created an open and obvious danger to recreational boaters and fishermen. Accordingly, we find that the second element for imposition of liability on the State is present in the instant case.

C. Causation
The third element of a cause of action for liability arising from ruin of a building is causation. Although the defendants sought to prove at trial that the object struck by Melerine's boat was not the oil well casing drilled by Stall and Smith and owned by the State, the trial court found that object struck was "[t]he well casing used in connection on State Lease 3938 and drilled by defendant Albert M. Stall and Victor P. Smith." Based on the record evidence, we find no manifest error in the trial court's conclusion that the oil well casing was a substantial factor in causing Melerine's injuries.

D. Notice
Because the State is a public entity, the fourth element of a cause of action for liability arising from ruin of a building is proof that the owner knew or should have known of the risk posed by the building, and that the owner nevertheless failed to take adequate steps to prevent the damage caused by the building. In the instant case, the trial court found specifically that the State had actual notice of both the existence and the nature of the oil well casing in question through the Department of Wildlife and Fisheries. That conclusion was based on the trial testimony of Brian Clark, an employee of that department, *842 "that he and many others employed by the department were well aware of the existence of the structure years before plaintiff's accident."
The court also found that the State had constructive notice of the oil well casing through the filings with the Department of Conservation, now the Department of Natural Resources. The record contains copies of a number of documents filed by Stall and Smith related to the oil well in question, as well as documents issued by the State in response to Stall and Smith's filings. Stall and Smith first filed an "Application for Permit to Drill (Or Renew) For Minerals" on January 23, 1963. On January 29, 1963, the State issued a "Permit to Drill For Minerals." An "Amended Permit to Drill for Minerals" was then issued on February 7, 1963, apparently to correct the description of the location of the drilling activity.
However, the most telling documents are the ones related specifically to the plugging and abandonment of the oil well. On March 2, 1963, Stall and Smith filed with the Department of Conservation, State of Louisiana, a "Plug and Abandon Report." That report contained the following entries:
1. Surface Casing Size 10¾" Depth 1860.40' Amount Pulled None
2. Protection Casing Size 16" Depth 26" Amount Pulled None
3. Production Casing Size None Depth_____ Amount Pulled___
 CEMENT PLUGS
1. Depth 1700' To 1850' No. of Sacks 150 How Placed HOWCO 
2. Depth 50' To 0' No. of Sacks 25 How Placed Hand 
On the same day the above report was filed, March 2, 1963, the State Department of Conservation, Minerals Division, issued a "Work Permit" to "Plug and Abandon," which stated as follows: "YOU ARE HEREBY AUTHORIZED TO SET CEMENT PLUGS AT 1700-1850'-0-50'." Obviously, the State had notice of the method by which Stall and Smith intended to plug and abandon the well; in fact, the State authorized the exact plug and abandon procedure they used.
Finally, we note that the pictures in the record, taken two days after Melerine's accident, reveal that the abandoned oil well casing and the remains of the surrounding platformincluding at least two creosote pilingswere very visible under ordinary conditions. The oil well casing and the surrounding piling were located on immovable property owned by the State. If the State did not have actual notice of their presence on its property, it unquestionably had constructive notice. The only way the State could have avoided knowing about the presence of the oil well casings and the pilings would have been to ignore themor to have failed to ever go on the propertyfor almost a 30-year period. The trial court's finding that the State had actual or constructive notice of the abandoned oil well casing is not manifestly erroneous.
The trial court also found that, despite such actual and constructive notice, the State "took no action with regard to the nature of the structure." Again, we find no manifest error in this finding.
Accordingly, the trial court properly imposed liability under negligence and strict liability principles on the State of Louisiana. The evidence reveals that the State was both owner and custodian of the oil well casing, the oil well casing presented an unreasonable risk of harm, the risk *843 of harm represented by the oil well casing caused Melerine's accident and injuries, and the State had notice of the oil well casing. Thus, the State is liable for Melerine's damages under both negligence and strict liability theories.

III. LIABILITY UNDER STATEWIDE ORDER 29-B
As noted above, the trial court made no finding concerning the ownership or custody of the abandoned oil well casing struck by Melerine. Instead, the trial court primarily based the liability of the defendants on its finding that Stall and Smith failed to comply with the requirements of Section XIX of Statewide Order 29-B, relative to procedures for plugging and abandonment of oil wells.
Statewide Order 29-B, as it was promulgated in 1943 and as it existed in 1963, when Stall and Smith plugged and abandoned the oil well in question, stated, in pertinent part, as follows:
A. All wells which are to be abandoned shall be filled with a mud-fluid of sufficient weight to offset the hydrostatic pressure of any of the formations penetrated. Substantial cement plugs must be efficiently placed in sufficient number and at proper locations as to prevent the commingling of oil, gas, salt water and fresh water from one formation to another (mud is not permanently efficient for this purpose). Before the work of abandonment is begun, a permit must be secured and a detailed plan of abandonment must be submitted to the District Manager for approval or modification to meet the local and specific needs. Any drilling well which is to be temporarily abandoned and the rig moved away, shall be mudded and cemented as it would for permanent abandonment, except a cement plug at the surface may be omitted.

(Emphasis added.) The last sentence of the above provision required "a cement plug at the surface" on drilling wells, like the one in the instant case, that were to be permanently abandoned, since "a cement plug at the surface [could] be omitted" only for wells that were "to be temporarily abandoned and moved away." Moreover, the District Manager had to approve or modify the "detailed plan of abandonment" for an oil well.
Stall and Smith claim that they visited the site only once, while the oil well was being drilled in 1963, and that they had no contact with the oil well casing for almost 30 years prior to Melerine's accident. The Melerines seek to impose liability on Stall and Smith because they left the abandoned oil well casing sticking up above the water line. However, all parties agree that the oil well was plugged and abandoned in accordance with regulations as they existed in 1963, quoted above, which required "a cement plug at the surface" for oil wells that are permanently abandoned. Moreover, the trial court found specifically that the oil well had been plugged and abandoned "in accordance with the regulations set out in Order 29-B at that time."
However, the trial court found that Stall and Smith were liable for Melerine's damages because they failed to comply with the requirements of Statewide Order 29-B as it was amended in 1976, some 11 years after the oil well in question was plugged and abandoned by Stall and Smith, when the Commissioner of Conservation (now, Commissioner of Natural Resources) amended Statewide Order 29-B to change the requirements for plugging and abandoning oil wells. Section F(3)(j) of the amended order provides, in pertinent part, as follows:
After placing the top plug, the operator shall be required on all land locations to cut the casing a minimum of two feet (2') below plow depth. On all water locations, the casing shall be cut a minimum of ten feet (10') below the mud line.
The trial court found that the amended order was intended to be applied retroactively. *844 In reaching that decision, the court cited § XIX(A)(1), which states as follows:
All oil wells drilled for oil or gas and found to be dry prior to or after the effective date of this order shall be plugged within ninety (90) days after operations have been completed thereon or ninety (90) days after the effective date of this order, whichever is later, unless an extension of time is granted by the Commissioner of Conservation.
The only previous Louisiana case to consider the retroactivity of the amended version of Statewide Order 29-B is Cockerham v. Atlantic Richfield Co., 92-200 (La. App. 3d Cir.3/3/93), 615 So.2d 547, writ denied, 623 So.2d 1303 (La.1993). In that case, the court found that the order was obviously intended to be applied retroactively because § XIII stated that the effective date was August 1, 1943. However, the copy of the order introduced at the trial of this case apparently without objection, does not contain a § XIII. In fact, the last paragraph of the order states that "[t]he Amendment shall be effective on and after March 1, 1974." The trial court did not rely on Cockerham, which, in our view, is incorrect. Given the circumstances, it does not provide any guidance to this court on this issue.
Amended Statewide Order 29-B, which changed the regulations governing plugging and abandonment of oil wells, is a substantive provision because it unquestionably established new rules, rights, and duties or changed existing ones. See Aucoin v. State through Department of Transportation and Development, 97-1967, p. 9 (La.4/24/97), 712 So.2d 62, 67. La. C.C. art. 6, relative to retroactivity of laws, provides as follows: "In the absence of contrary legislative expression, substantive laws apply prospectively only." (Emphasis added.) In the instant case, the amended order was issued by a commissioner, a member of the executive branch of government, not by the Legislature. Thus, the Commissioner of Conservation had no authority to apply the amended order retroactively.
Our finding that the Commissioner of Conservation lacked authority to impose the requirements of amended Statewide Order 29-B retroactively is supported by LSA-R.S. 30:4, which limits the authority of the commissioner. Section (D)(1)(b) of that statute provides as follows:
D. The assistant secretary shall make, after notice and public hearing as provided in this Chapter, any reasonable rules, regulations, and order that are necessary:
(1) To require that ... oil wells; and all associated structures, including any fittings, tie-overs, appliance, and equipment, which are constructed on state water bottoms pursuant to the grant of a right-of-way by the secretary of the Department of Natural Resources or the issuance of a lease by the State Mineral Board shall conform to the following provisions:
* * *
(b) Upon abandonment of a pipeline, oil well, or associated structure, the owner or operator thereof shall be responsible for removing any related object above the mudline which may unduly interfere with other uses of state waters or water bottoms, including navigation or fishing, or shall adequately mark it for the duration of the obstruction according to regulations of the United States Coast Guard and regulations promulgated by the assistant secretary. If necessary for environmental reasons or to prevent undue interference with other uses of state waters or water bottoms, the owner of an abandoned buried pipeline, oil well, or associated structure; an abandoned pipeline, oil well, or associated structure; or portions thereof shall cause removal of that which constitutes an obstruction or hazard to navigation or fishing, as determined necessary by the assistant secretary after a public hearing.
*845 (Emphasis added.) The above statute allows the commission to impose requirements regarding the removal of an oil well casing on an oil well owner or operator upon abandonment, not after abandonment. Thus, the legislature granted the commissioner no power to impose requirements retroactively.
Moreover, even if a commissioner had authority to impose retroactive provisions, the jurisprudence interpreting La. C.C. art. 8, the predecessor to La. C.C. art. 6, consistently required that the expression of legislative intent that a law be applied retroactively be clear and unambiguous. See Charrier v. Charrier, 94-921, p. 5 (La. App. 5 Cir. 4/12/95), 653 So.2d 1356, 1359. In the instant case, the commissioner's intent to apply Statewide Order 29-B retroactively is not clear. The trial court's finding that it was intended to be applied retroactively is based on the fact that the first sentence of § XIX(A)(1) refers to "[a]ll wells ... found to be dry prior to or after the effective date of this Order" (emphasis added). That sentence is insufficient to constitute a clear statement of intent to apply the amended order retroactively.
Finally, the State's authority to impose retroactive requirements on Stall and Smith was also limited by the lease agreement between the State and Lujon, which provided as follows:
To the extent such permit is required, there is included in the rights herein granted, a special permit to conduct geophysical and geological work on the leased premises and, where shot points are used in navigable waters, such works shall be done under applicable rules, regulations and statutes in force at the time such work is conducted.

(Emphasis added.) Thus, amendments to regulations adopted after the work was concluded do not change the obligations of Stall and Smith. Accordingly, the trial court's finding that Stall and Smith are liable for Melerine's injuries because of their failure to comply with the requirements of amended Statewide Order 29-B is reversed.

IV. STATE'S IMMUNITY FROM LIABILITY
The State claims that it is immune from liability in this case under the provisions of the Recreational Use Immunity Statutes: LSA-R.S. 9:2791, relative to liability of the owner of property not used primarily for commercial recreational purposes, and 9:2795, relative to liability of landowner of property used for recreational purposes, property owned by the Department of Wildlife and Fisheries, and parks owned by public entities. The State argues as follows: "Since the trial judge only contemplated a duty on the State as owner of the water bottom, the statutes establish the State owed no duty of care to the recreational fisherman Melerine." (Emphasis in original.)
However, we have found that the State is liable as the owner of the abandoned oil well casing itself, not just the owner of the water bottom. Moreover, the State failed to prove on the record any of the elements necessary for application of the Recreational Use Immunity Statutes. The well-recognized purpose of the Recreational Use Immunity Statutes is "to induce private owners of large acreages to open expanses of undeveloped lands for public outdoor, open land recreational purposes." Verdin v. Louisiana Land and Exploration Co., 693 So.2d 162, 165 (La.App. 4 Cir. 3/12/97). Application of the statutes to immunize the State from liability in this case would not further that purpose. In fact, the evidence and maps submitted in this case indicate that the land where the oil well casing was located was not an "open expanse of undeveloped land," but a navigable waterway leading into the Gulf of Mexico.
More importantly, it is well settled that one of the requirements for application of the Recreational Use Immunity Statutes is that "the injury-causing instrumentality must be of the type normally encountered *846 in the `true outdoors' and not of the type usually found in someone's backyard." Id. at 167. In Eschete v. Mecom, 509 So.2d 840 (La.App. 1 Cir.), writ denied, 513 So.2d 821 (La.1987), the court found that oil well cribbings submerged underwater in a dead-end canal connected at one end of the intercoastal canal were not instrumentalities normally encountered in the true outdoors because they resulted from a commercial enterprise. Id. at 843. Thus, the Recreational Use Immunity Statutes do not apply to this case, involving an abandoned oil well casing resulting from a commercial enterprise.
Moreover, the State failed to present any evidence to prove the applicability of the Recreational Use Statutes. The record contains no evidence concerning the primary use of the property in question. The record likewise contains no evidence that the property was owned or controlled by the Department of Wildlife and Fisheries, as opposed to some other department or entity of the State. Under the circumstances, we find no merit in the State's arguments concerning the Recreational Use Immunity Statutes.

V. LIABILITY UNDER GENERAL MARITIME LAW
The trial court also found that Smith and Stall were liable for Melerine's injuries because the exposed oil well casing was an "obstacle to navigation" which was a "substantial factor" in causing the accident. Stall and Smith challenge the factual finding that the structure was an obstacle to navigation by citing extensively to testimony indicating that everyone who used the area where the accident happened, including Melerine, was aware of the presence of the structure and had been able to avoid hitting it for more than 30 years. In fact, they argue, the structure was actually a benefit to navigation because it was a well-known marker.
For the reasons stated in the section of this decision holding that the oil well casing was unreasonably dangerous, we find no error in the trial court's holding that the oil well casing was an "obstacle to navigation." The unlit, unmarked oil well casing was located just outside a deep water channel of a well-known inlet and thus was an obstacle to navigation. Further, when the tide was exceptionally high, the oil well casing became submerged, which increased the possibility that the oil well casing would cause injury or damages.
In order for a party's actions or omissions to be considered a "legal cause" of an accident under general maritime law, those actions or omissions must be a "substantial factor" in the accident. Usé v. Usé, 94-0972, p. 3, (La.App. 1 Cir. 4/7/95), 654 So.2d 1355, 1359. The trial court's finding that the presence of the submerged oil well casing was a substantial factor in causing Melerine's accident is not manifestly erroneous. Thus, the trial court properly imposed liability under general maritime law.
However, the only defendant that may be held liable for injuries caused by the oil well casing under general maritime law is the State, which both owned and had custody of the oil well casing. Stall and Smith cannot be held liable under any discernable maritime principles because they had no legal relationship to or responsibility for the oil well casing at the time of Melerine's accident. Accordingly, we reverse the trial court judgment to the extent it imposed liability on Stall and Smith based on general maritime principles.

VI. MELERINE'S COMPARATIVE LIABILITY
The owner of a building in ruin under La. C.C. arts. 2317 and 2322 is responsible for the damages unless he proves the damages were caused by the fault of the victim, by the fault of a third person, or by an irresistible force. Sistler, 558 So.2d at 1113. Moreover, comparative negligence principles apply in cases based on strict or absolute liability. Pelt v. City of DeRidder, 553 So.2d 1097, 1099 (La. *847 App. 3d Cir.1989); Simmons v. Board of Commissioners of The Bossier Levee District, 624 So.2d 935, 955 (La.App. 2d Cir. 1992). The trial court assigned Melerine 20 percent comparative negligence because he knew of the existence of the oil well casing and failed to use "an alternative safe route to avoid the casing."
Generally, "a person is legally required to recognize when his conduct involves a risk of harm and to take reasonable precautions to prevent such harm." Pitre v. Louisiana Tech University, 26,388, p. 12 (La.App.2d Cir.5/10/95), 655 So.2d 659, 669. Moreover, under principles of general maritime law, some courts have imposed a presumption of negligence per se when a moving vessel strikes a stationary object that is a hazard to navigation and violates a law designed to prevent collisions. See Usé, 94-0972 at 5, 654 So.2d at 1359, citing Board of Commissioners of Port of New Orleans v. M/V Agelos Michael, 390 F.Supp. 1012 (E.D.La.1974). The stationary object in this casei.e., the oil well casingwas an open and obvious danger.
Melerine's testimony indicates that he was aware of the existence of the oil well casing, but that he failed to slow his boat down when he reached the area where he knew the casing was located. Melerine testified that the water was very high at the location on the day of the accident, and that he believed that he had gone far enough to the side to avoid the casing. Given the fact that he was aware of the casing but nevertheless operated his vessel at top speed in the area, we find no manifest error in the trial court judgment to the extent it assigned comparative fault to Melerine.

VII. ALLOCATION OF FAULT
The trial court imposed 40 percent of the fault for Melerine's accident on the State, 40 percent of the fault on Stall and Smith, and 20 percent of the fault on Melerine. As we have found that Stall and Smith are not liable for Melerine's accident, the allocation of fault imposed by the trial court must be modified.
Application of comparative fault principles in cases involving victim fault was explained by the Louisiana Supreme Court as follows in Sistler, 558 So.2d 1106:
When a court finds victim fault, comparative fault principles are applied on a case-by-case basis. Landry [v. State, 495 So.2d 1284 (La.1986).] Courts applying the victim fault defense inquire whether reducing the negligent plaintiff's recovery would serve as an incentive for similarly situated plaintiffs to exercise care, while not reducing the incentive of the owner of the thing to remove the risk of harm. Id. Reduction of plaintiffs recovery should not diminish the defendant's incentive to remove the unreasonable risk from his property. Id.; [Crawford, "Torts: Recent Developments in the Law, 1986-1987," 48 La. L.Rev. 507, 511 (1987)].
The factors to be considered in determining fault include the following: (1) Whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) How great a risk was created by the conduct, (3) The significance of what was sought by the conduct, (4) The capacities of the actor, whether superior or inferior, and (5) Any extenuating circumstance which might require the actor to proceed in haste, without proper thought. Guerra v. White, 97-2391, p. 8 (La.App. 4 Cir. 6/16/99), 755 So.2d 894, 898, citing Watson v. State Farm, 469 So.2d 967, 974 (La.1985).
Concerning the first factor for determining fault, we have found that both the State and Melerine were aware of the danger imposed by the abandoned oil well casing. The State's awareness of the danger is discussed above, in the section of this opinion relative to the notice issue. Regarding Melerine, the record in this case indicates that he had navigated the waterway where the abandoned oil well casing was located for some 30 years. Melerine had seen the structure on a regular *848 basis throughout that time. As a professional and commercial fisherman during parts of his life, Melerine was very familiar with the waterway and with the obstacle located in the waterway.
Concerning the second factor for determining fault, the evidence indicates that the oil well casing had been in the same location for 30 years without causing any accident, thus the risk created by its existence was comparatively low. However, Melerine's conduct in driving his boat at top speed at extremely high tide in an area where he knew an abandoned oil well casing was located involved a comparatively high risk. Concerning the third factor, nothing significant was sought by the State in allowing the abandoned oil well casing to remain on its property, while Melerine was trying to get home, which was a significant motivation for his conduct.
Concerning the fourth factor for determining fault, the relative capacities of the State and Melerine for avoiding the accident was approximately even. The State could easily have removed the oil well casing at any time prior to the accident, while Melerine could have exercised more care, slowed his boat, and given the oil well casing a wider berth when passing through the area where he knew the casing was located. Concerning the fifth factor, no extenuating circumstances required Melerine to proceed in haste.
The State claims however that Melerine should be assigned 100 percent of the liability for his damages, as opposed to the occurrence of the accident itself. At trial, the State attempted to present the opinion testimony of Commander Cole, offered as an expert in vessel operations. By proffer, Commander Cole testified that Melerine would not have suffered any injury to his back or caused damage to his boat, even if he had hit the oil well casing, if he had hit the casing at a lower speed. Moreover, Commander Cole testified that Melerine's back injury might have been caused by his unnecessary decision to jump into the water in order to patch his boat. Commander Cole testified that Melerine could have patched the boat from the inside and thereby avoided injury. We have reviewed Commander Cole's proffered testimony and find that it would not have greatly impacted the result in this case.
This court is required to apply the manifest error standard to the trial judge's allocation of fault. That standard was explained by the Louisiana Supreme Court as follows in Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607:
Regarding the allocation of fault in this circumstance, we adopt the standard set forth in Coco v. Winston Industries, Inc., 341 So.2d [332], 335 [(La. 1976).] Just like in the quantum area, there is for sure a large amount of uncertainty in the allocation of fault. Our Coco decision pointed out that "The ultimate determination by an appellant court as to whether a given judge or jury abused their `much discretion' as a matter of law is a judgment call." 341 So.2d at 335.
Because the trial judge did not abuse its "much discretion" in assigning a greater share of the liability to the State than to Melerine, we preserve the trial court's original judgement to the extent it assigned 40 percent of the fault for the accident to the State and 20 percent of the fault to Melerine. However, the 40 percent fault assigned to Stall and Smith, whom we have found are not liable for Melerine's accident, must be reassigned equally to the remaining parties. Accordingly, we assign 60 percent fault for the accident to the State and 40 percent fault to Melerine. Because we have found that the State is the only defendant liable to the Melerines in this case, the Melerines' arguments relative to the trial court's apportionment of fault on a joint and several basis are moot.

VIII. CALCULATION OF INTEREST
By amended judgment, the trial court awarded prejudgment and post-judgment *849 interest on all past damages in accordance with the guidelines set forth in 28 U.S.C. § 1961, but only postjudgment interest on all future losses. The Melerines, by cross-appeal, challenge this finding, arguing that 28 U.S.C. § 1961 does not control the interest issue in the instant case. In Milstead v. Diamond M Offshore, 95-2446 (La.7/2/96), 676 So.2d 89 (La.1996), the court held that prejudgment interest on future losses is not appropriate under federal law unless "an action is based strictly on the Jones Act," so long as the case is tried to the court and the court exercises its admiralty jurisdiction. Id. at 97. However, the court said, in cases like the instant case, which is not based strictly on the Jones Act, a court has no authority to "grant prejudgment interest on general maritime and Jones Act awards for future damages, be they future lost earnings or future pain and suffering." Id. The rationale for the rule was explained by the court has follows: "recovery of interest on losses not yet incurred effectively grants the recipient double recovery." Id., quoting Martin v. Walk, Haydel & Associates, Inc., 794 F.2d 209 (5th Cir.1986). Accordingly, the trial court's interest calculations are affirmed.

IX. CONCLUSION
The trial court judgment is reversed to the extent it found Stall and Smith liable for Melerine's accident and injuries. The trial court judgment is affirmed to the extent it found the State of Louisiana liable for Melerine's accident and injuries. The trial court judgment is affirmed to the extent it found Melerine comparatively at fault in causing his own accident and injuries. The judgment is amended to assign 40 percent liability to Melerine and 60 percent liability to the State of Louisiana. In all other respects, the judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AMENDED.

ON REHEARING
PER CURIUM.
REHEARING DENIED; OPINION CORRECTED.
We issue this per curium for the sole purpose of correcting the last paragraph of our original opinion, issued on November 8, 2000, to reflect that the correct apportionment of fault is 40 percent to Mr. Melerine and 60 percent to the State of Louisiana.
[Editor's Note; Amendment incorporated for publication purposes].
NOTES
[1] Originally, the Melerines also appealed the trial court's judgment dismissing Mrs. Melerine's claim for loss of consortium damages. However, their attorney conceded at oral argument before this court that the Melerines are not entitled to loss of consortium damages under general maritime law. Accordingly, this opinion will not address that issue.